392 So.2d 1046 (1980)
STATE of Louisiana
v.
John D. HUFF, Johnnie Donald, Jr., Gerald Donald, Kenneth D. Sanford and Howard Wayne Phillips.
No. 67576.
Supreme Court of Louisiana.
December 15, 1980.
*1047 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John Sturgeon, Dist. Atty., Glenn Gremillion, Asst. Dist. Atty., for respondent (plaintiff).
Philip A. LeTard, Vidalia, for defendant-relator.
BLANCHE, Justice.
Defendants were indicted by a Concordia Parish Grand Jury for knowingly and intentionally possessing with intent to distribute a controlled dangerous substance (marijuana) in violation of La.R.S. 40:966(A). Defendants filed the following motions prior to the commencement of a trial: (1) Motion for In Camera Inspection of the Grand Jury Proceedings; (2) Motion to Subpoena the District Attorney's Testimony; (3) Motion to Compel the Testimony of the Foreman of the Grand Jury; (4) Motion to Quash the Grand Jury Indictment; (5) Motion to Suppress Statements of Certain Defendants, and (6) Motion to Reduce Bond and Remove Restrictions. The trial judge denied each motion and, upon application by defendant, this Court granted a writ to review these rulings. The ruling regarding the Motion to Reduce Bond and Remove Restrictions has previously been considered by this Court. We now affirm the trial court's rulings on the remaining motions.
The record shows that defendants were arrested after first being indicted for this offense. The state maintains that the prosecution of these defendants initiated after an ex-police officer found fragments of photographs depicting the defendants with large quantities of what appeared to be marijuana, and turned these fragments over to the Vidalia City Police who, in turn, released them to the Concordia Parish Sheriff's Department. According to the prosecution, Mike Clark discovered portions of what proved to be 13 photographs in a rural area of Concordia Parish, alongside a road, while he was working in the area laying telephone cable in the course of his employment with a general contractor.
After piecing together these photographs, personnel for the Sheriff's Department were allegedly able to identify the persons in these photographs as the defendants, who were all residents of Concordia Parish. The Sheriff's Department had these pieced together photographs in its possession for approximately two to three months prior to the time the prosecution sought a grand jury indictment of the defendants and, according to Deputy Sheriff Schiele, had yet to locate the building or house where the *1048 pictures had been taken at the time of the indictments, and were unaware of where the suspected crime had taken place. Defendants were all arrested after the issuance of bench warrants either the night the grand jury indicted them, or shortly thereafter.
After the arrests of defendants John D. Huff and Kenneth F. Sanford, each gave taped statements to the Concordia Parish Sheriff's Department. Apparently defendant Gerald Donald also gave a statement to the police following his arrest. Based upon the statements of Kenneth Sanford and Gerald Donald, the Sheriff's Department secured a search warrant to search the home of defendant Johnnie Donald, Jr. and to seize or photograph certain household and personal items, and contraband and drug paraphernalia depicted in the photographs referred to above. The Sheriff's Department executed the search warrant, found some of the items for which they were searching, seized them, and took photographs of other items and of the scene. The execution of the search warrant document indicates nothing suspected to be marijuana was found, aside from "one small burnt cigarette of a green vegetable like material appearing to be marijuana".
In the various motions filed by defendants, they contest the validity of their indictments, the legality of their arrests, the use of the statements of Kenneth Sanford and John D. Huff given by them following their arrests and the validity of the search warrant and seizure of evidence in the course of the execution of that warrant.

Probable Cause to Arrest Defendants
At the outset, defendants argue that the photographs in the possession of the Concordia Parish Sheriff's Department do not, alone, establish probable cause to arrest them on the charge of possession of marijuana with intent to distribute. Defendants further contend that the existence of the grand jury indictment also does not provide the requisite probable cause to arrest and that the only evidence the state had against them and which was presented to the grand jury was the above mentioned photographs. Consequently defendants moved to suppress the statements of John D. Huff and Kenneth Sanford, which the Concordia Parish Sheriff's Department secured from them following their arrests since they contend those statements were the fruits of illegal arrests.
Defendants attempted through various motions to prove their contention that the photographs were the only evidence against them presented to the grand jury. However, the trial judge refused defendants' request that he conduct an in camera inspection of the grand jury proceedings to make this determination. He also refused to allow the defendants to compel the testimony of the foreman of the grand jury on the issue of what evidence the prosecution presented to them in this case. Finally, the judge did not allow defendants to call the district attorney to the stand to question him as to whether he felt a duty to advise the grand jury not to indict in cases where he felt there was insufficient evidence to indict. Defendants contended that the House of Delegates of the American Bar Association recognizes such a duty. The trial judge's rulings denying the above motions were apparently in part motivated by a desire to protect the secrecy of the grand jury proceedings, and also by the judge's opinion that an indictment handed down by a grand jury in itself provides probable cause to arrest. At the trial of the motion to suppress, the trial judge indicated that the grand jury indictment of defendants properly served as the basis for the issuance of the arrest warrants in this case.
This Court has previously held that a grand jury indictment serves as a determination of probable cause to hold a defendant on a charge and is a reasonable alternative to a preliminary hearing to determine probable cause to hold. See State v. Qualls, 377 So.2d 293 (La.1979). In that case, we emphasized that the grand jury is composed of twelve citizens chosen from a cross-section of the community and is charged with the responsibility and authority delegated by law to grand jurors. Further, the grand *1049 jury indictment "procedure is well-designed to protect the accused from an overbearing government prosecutor or false accusations. Before an indictment is returned this body must be satisfied that probable cause exists that the accused committed the crime and should be held for trial to defend himself ...".
The grand jury has a statutory mandate to indict "when, in its judgment, the evidence considered by it, if unexplained and uncontroverted, warrants a conviction." C.Cr.P. art. 443. This standard for rendering an indictment is a more stringent one and requires stronger proof than a finding of probable cause to arrest, i. e., probable cause to believe a crime has been committed by the arrestee. Our state constitution recognizes the significance of the grand jury and requires an indictment by a grand jury for a capital crime or crime punishable by life imprisonment before any prosecution for these crimes may proceed. La.Const. art. 1, § 15. Considering the importance ascribed to the grand jury in our judicial system and the high standard of proof required for a grand jury indictment, we hold that such an indictment establishes probable cause to arrest and is sufficient to protect the privacy of citizens of this state and to shield them from unwarranted arrests. The United States Supreme Court has taken this position since 1932. See Ex Parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932); Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54, footnote 19; Michigan v. Doran, 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978) footnote 6 in concurring opinion.

Validity of the Grand Jury Indictment
Defendant also questions, in a Motion to Quash the Indictments, the validity of those indictments themselves, alleging that there was insufficient evidence to indict. It is well settled that a grand jury indictment cannot be attacked on the basis of insufficient evidence that the crime has been committed. State v. Edgecombe, 275 So.2d 740 (La.1973). For this reason, the judge correctly denied the motion to compel the testimony of the foreman of the grand jury and the motion for an in camera inspection which were in aid of defendant's attack on the sufficiency of the evidence presented to the grand jury. The lower court ruling that the district attorney would not be subpoenaed to testify regarding any duty he felt to advise the grand jury not to indict for lack of evidence was also proper. Defendants failed to prove the existence of such a standard or its applicability to a Louisiana district attorney.
Defendants also contend that the instant indictments are invalid because the grand jury did not receive a written charge required by C.Cr.P. art. 482, which provides in part: "After the oath is administered to the members of the grand jury, the judge shall charge them orally in open court upon their duties, rights and powers. Upon completion of the charge the judge shall give the grand jury a written copy of the charge." Defendants' position is that the grand jury was empaneled in April and orally charged at that time, but the jury was not charged when it was recalled in August.
This Court has held, in State v. Starr, 52 La.Ann. 610, 26 So. 998 (1900), that the fact that the minutes of the court did not reflect that the grand jury which returned the indictment was charged, was not reversible error. In light of this jurisprudence and the fact that the instant grand jury was charged at least once in April, we hold that the members were properly apprised of their rights, duties and powers, and the lack of a written charge when the jury was recalled does not affect the validity of the indictments at issue. These indictments may therefore supply the probable cause for the arrests of the defendants.

VOLUNTARINESS OF STATEMENTS

Statement of John D. Huff
Defendants allege, as an alternative basis for their motion to suppress the statements of Huff and Sanford, that these statements were not freely and voluntarily given. Defendants contend that defendant Huff was *1050 under the influence of two 100 mg. tablets of seconal at the time he made his statement and was unable to knowingly and intelligently waive his right to remain silent. They also allege that the Sheriff of Concordia Parish pressured Huff into making his statement by telling him if he cooperated he could possibly avoid going to federal prison or to Angola.
John Huff testified that he had worked from 2:00 p. m. to 10:00 p. m. on an oil rig in Adams County, Mississippi the night of his arrest. After working, he rode home to Concordia Parish with fellow worker Steven Dodd. Both Dodd and Huff testified that Huff took two 100 mg. tablets of seconal during the drive home to help him to sleep. The state stipulated Dodd had a prescription for the drug. According to Huff, he also had two or three beers on the way home.
Huff was arrested by Concordia Parish Sheriff's Deputies at his home at approximately 11:30 p. m., was booked at the courthouse at 11:50, and then taken to Sheriff Schiele's office. Both defendant and Sheriff Schiele testified that, at first, Huff refused to make any statement. According to Sheriff Schiele, he spoke to Huff for about ten minutes and did not threaten him or promise him anything in exchange for a statement. The Sheriff specifically denied telling Huff that agents of the federal government were "after him" and that he would try to protect him from them. Huff, on the other hand, maintained that the Sheriff told him there was a federal indictment for his arrest and, that if he cooperated, it would be a lot easier on him and he could stay in Concordia Parish and would not be sent to Angola. However, Huff did testify that the Sheriff repeatedly told him that he could not promise him anything. When questioned about Huff's physical condition when he saw him the night of his arrest, Sheriff Schiele noted that Huff did seem sleepy and that he spoke slowly, but he attributed the sleepiness to the lateness of the hour, and stated that Huff's speech pattern that night seemed to be his normal one as observed on other occasions. Huff described his physical condition the night of his arrest as "pretty bad" and stated that he was "just tired, from working hard".
After defendant Huff spoke with Sheriff Schiele, he testified he remembered talking to another man who told him he ought to cooperate, but Huff still refused to talk. Some time later Huff apparently changed his mind and, in his words, told Deputy Sheriff Lyle Schiele (son of Sheriff Schiele and an old classmate and acquaintance of Huff's) that he "was ready to get it over with". He then gave the statement at issue to Deputy Schiele at approximately 2:54 a. m.
Deputy Lyle Schiele, who was also the arresting officer of Huff, testified as to this defendant's physical condition the night of his arrest. Schiele stated he followed defendant home as he drove his vehicle from the spot where his fellow worker had dropped him off in Vidalia after their ride home from work. He felt that Huff had "driven fine" and when he spoke to him he did not appear to be intoxicated or drugged or any sleepier than could be expected after working all day. Schiele also testified that he did not coerce Huff or promise him anything in order to get a statement from him and believed Huff's statement to be free and voluntary.
Dr. Allen M. Read testified to the effects of the drug seconal on the human body. He stated that seconal was commonly used as a sleeping pill and had a depressant effect, making a person drowsy. The drug's action usually began within fifteen or twenty minutes from the time it was taken and its full effect would last about three to six hours, with a "hang-on" effect following. Dr. Read described the effect of the drug as simply making a person drowsy, but indicated that a high enough dose could have an hypnotic effect. He felt that two hundred milligrams of seconal could slow down a person's thought processes to the extent that he could not make a decision whether to remain silent and would not know whether a statement he made was inculpatory or incriminating. One or two beers would cause the effect of the drug to be *1051 slightly stronger, and the drug would also have a greater effect the more fatigued a person was. Dr. Read explained that the drug's effect varied depending on the particular individual and that age, height, weight and physical condition were relevant to the drug's effect. He testified that he has not examined defendant Huff to determine his particular physical condition.
Considering all of the above testimony, we feel that John Huff freely and voluntarily made the statement at issue to the Sheriff's Department. He did not testify that he was threatened or coerced in any way. Huff's testimony regarding Sheriff Schiele's comments about federal involvement and promises to keep him in the Parish were specifically rebutted by Sheriff Schiele, and the trial judge apparently attached more credibility to the Sheriff's testimony on this point. It is significant, also, that Huff admitted that the Sheriff repeatedly told him "I can't promise you anything, now." There was no evidence presented at the hearing on the motion to suppress of any other alleged promises or coercion other than Huff's statement that someone at the Sheriff's Office told him "he ought to cooperate". This can not be considered a coercive statement, or threat, or a promise, and Huff testified that the statement did not change his decision not to say anything at that time. Huff testified that he finally told his acquaintance Lyle Schiele that "I'm ready to get it over with", just prior to giving Schiele his statement. The defense points out that defendant was in custody at the courthouse from 11:50 until 2:54 before he made his statement, and argues that the state cannot account for all of this time period. There is no allegation of threats, coercion or promises made to Huff other than those addressed above. In the absence of some indiction of an event in this time frame that would affect the voluntary nature of his statement, we do not feel that the failure of the state to account for Huff's activities for every moment of time spent in custody should affect the admissibility of Huff's statement.
The testimony also indicates that Huff's statement made approximately 4½ hours after he allegedly took seconal was not rendered involuntary by the effect of the drug. Even assuming defendant took the drug in the amount he claims, the testimony as to its effects on Huff is far from conclusive. The doctor who testified did not particularize the effects of the drug as to Huff, although he stipulated that the drug's effect varied among individuals. Also, he stated that the drug simply made one sleepy, and only that an unspecified "high dosage" could have an hypnotic effect. His opinion that "someone" would be unable to make a decision as to a waiver of his rights must be discounted as a hypothesis that was not related to any of the facts surrounding Huff's waiver.
Huff himself testified that he felt "sleepy". Sheriff Schiele and Deputy Schiele both confirmed that defendant acted sleepy, but not intoxicated or drugged, according to Deputy Schiele. An examination of the transcript of Huff's statement does not reveal that Huff was suffering from any impairment to his ability to make a knowing and intelligent waiver of his right to remain silent. There is no indication that Huff requested sleep or stated to the Sheriff's Department personnel that he was, for any reason, overly drowsy or not in control of himself. There is no absolute duty on law enforcement officials to question an arrested suspect as to his physical condition prior to taking a statement from him. Under the evidence we have before us, we feel that the state has met its burden of proving that defendant John Huff's statement was made freely and voluntarily, and that he made a knowing and intelligent waiver of his right to remain silent.

Statement of Kenneth Sanford
In attempting to suppress defendant Sanford's statement, the defense argues that Sanford was not given his Miranda warning prior to the time he made statements in which he implicated himself. Although it is conceded that Sanford was fully advised of his rights prior to a taped statement given to Investigator Paul Scott, defendants contend *1052 that this taped statement was a fruit of the prior incriminating statement he alleges was made before any Miranda warning was given. Defendants also argue that Sheriff Schiele told Sanford of federal involvement in the case and may have made promises to try to keep Sanford out of a federal investigation if he cooperated. Finally, they assert that the Sheriff's refusal to allow Sanford's father into the room where Sanford was questioned was a coercive tactic.
We find that the evidence shows that defendant was read his Miranda warnings prior to making any statement. There is some question as to whether Deputy Lyle Schiele or Deputy Hal Harp gave Sanford his Miranda warnings when they arrested him. However, the booking sheet reflects that Deputy Bruce "booked" defendant, and that defendant did receive his Miranda warnings at this time. Deputy Bruce's testimony confirms that he did book defendant and read him his Miranda warnings. It is the position of the defense that although defendant may have been read his rights when booked, the booking did not occur until after the statement was given. There is evidence to indicate that the booking did occur prior to any statement by Sanford.
Defendant was arrested at the home of his parents, and rode to the courthouse after his arrest in his parent's vehicle. Defendant and his parents each testified that the arresting officers did not read defendant his rights at the time of his arrest, and that upon arrival at the courthouse, defendant was not booked, but was taken straight upstairs to Sheriff Schiele's office and did not go back downstairs until after he made the statement. Although the Sheriff testified that it was his understanding Sanford was not booked downstairs before he was brought upstairs, the booking sheet reflects the booking time as 7:45. Defendant was arrested at 7:21 and gave his statement at 8:10. It is clear that if the time of booking was correctly logged in the booking sheet, defendant was advised of his rights prior to going upstairs and making any statement. Deputy Bruce testified that he did advise defendant of his rights when he booked him and then gave defendant the booking sheet for him to read his rights himself and that defendant then signed the sheet. He stated that 7:45 was the time he booked Sanford. The conflict in testimony as to whether defendant was read his rights was apparently resolved against defendant by the trial judge. We find that there was credible evidence to support the trial judge's finding that defendant was advised of his rights prior to making any incriminating statement.
We further find that Sanford's statement was not a result of any threats, coercion or promises. The evidence shows that Sanford was questioned alone by Sheriff Schiele. Defendants allege that Sanford's father requested that he be allowed to stay with Sanford during the questioning and that the Sheriff refused his request. The absence of defendant's father during the questioning does not affect the voluntariness of defendant's subsequent statement. Defendant was a major at the time of the arrest and, unlike the situation in State v. Welch, 337 So.2d 1114 (La.1976), he was not mentally handicapped or otherwise in need of guidance. Defendant's father was not an attorney. Defendant had no right to have his father with him during questioning.
Sanford testified that he gave his statement to an investigator for the district attorney's office after talking with Sheriff Schiele. He stated that Sheriff Schiele first showed him the photographs referred to above and told him he knew that he was involved in the case. He allegedly also told him there were federal men downstairs and that he wanted to keep him and the other defendants in Concordia Parish. At this point, defendant says he admitted his involvement in the case. He was then taken to investigator Paul Scott's office, advised of his rights, and gave a typed statement.
According to Sheriff Schiele, Kenneth Sanford expressed a willingness to make a statement when he talked to him. He admitted "probably", showing the pictures to Sanford and telling him he "pretty much *1053 knew what had happened". He also testified that he did not make any threats or promises to Sanford and did not mention any "federal involvement" in this case to Sanford. Again, the trial judge apparently resolved any conflicts in testimony against the defendant and in favor of the state's witnesses. Under the above facts, we find that there was credible evidence to support the trial judge's ruling that Kenneth Sanford's statement was made freely and voluntarily.

Suppression of Evidence Seized Pursuant to the Search Warrant
Defendants allege that the affidavit for the search warrant discussed above did not sufficiently establish probable cause to search. They argue that the affidavit stated that the information the affiants received shows that the photographs referred to above were taken at the residence sought to be searched some time just before Easter of 1979. The search warrant was issued on August 28, 1979. Defendants argue that a 4-month period had thus passed since marijuana was alleged at that residence and there was no probable cause to believe that any marijuana remained at the residence at the time the search warrant was issued. We recognize that included within the general concept of probable cause for issuance of a search warrant is the reasonable belief that contraband or evidence will not be disposed of, but will remain at the place to be searched at the time of the proposed search. State v. Boneventure, 374 So.2d 1238 (La.1979). As the trial judge noted, it may be that the fact that large amounts of marijuana had allegedly been at the residence sought to be searched would provide continued probable cause to believe some marijuana would remain on the premises after a 4-month period. In any event, the judge held that there was probable cause to believe that the other items named in the search warrant that were sought to be seized or photographed remained on the premises at the time the search warrant was issued. The warrant, for example, listed such items as cooking pans, a wall plaque, a guitar case and guitar, a camera and a coffee table. We agree that probable cause existed to search for such items at the time the search warrant was issued and the search conducted.
Defendants also contend that the search warrant was invalid since the affidavit in support of this warrant does not allege that Kenneth Sanford or Gerald Donald (sources of the information in the affidavit) were reliable informants. The affidavit did, in fact, set forth sufficient underlying circumstances and details to provide a factual basis for determining the reliability of the informant and information. Both informants were named, and the reliability of their information was clearly established by the fact that they were participants in the alleged crime and spoke from first hand knowledge. State v. Paciera, 290 So.2d 681 (La.1974). Also, the fact that each defendant made statements against their own interests and which incriminated them, lends credibility to this source of information. State v. Welsh, 371 So.2d 1314 (La.1979). The affidavit is sufficient to establish the requisite probable cause to search.
For the above reasons, the trial judge's rulings on these pre-trial motions of defendants are affirmed.
AFFIRMED.
LEMMON, J., concurs and assigns reasons.
CALOGERO, J., concurs and joins in reasons assigned by LEMMON, J.