397 So.2d 506 (1981)
STATE of Louisiana
v.
David Jon LINER.
No. 80-KA-2109.
Supreme Court of Louisiana.
April 6, 1981.
*508 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., William B. Faust, III, James F. McKay, Asst. Attys. Gen., for plaintiff-appellee.
Arthur A. Lemann, III, New Orleans, Allen A. McElroy, Jr., Berwick, for defendant-appellant.
GARRISON, Justice ad hoc.[*]
The defendant, David Jon Liner, was indicted in September, 1978, by the St. Mary Parish Grand Jury for the 1st degree murder of Roxanne Barrilleaux, in violation of La.R.S. 14:30. Inasmuch as the murder victim was a former secretary of the St. Mary Parish District Attorney's Office, that office was recused from prosecution of the case and the Attorney General's Office appointed to prosecute. Following trial of the defendant by a twelve-person jury from October 29, to November 1, 1979, the defendant unanimously was found guilty as charged. At the conclusion of the sentencing portion of the bifurcated trial the jury recommended a sentence of life imprisonment. The defendant's motion for a new trial was denied by the trial judge and a life sentence in accordance with the jury's recommendation was imposed.
In retrospect, the facts of this case are relatively simple. However, this hardly was apparent to the investigators at the outset.
In the early morning hours of May 20, 1978, in the kitchen of her trailer home, Roxanne Barrilleaux was repeatedly stabbed with forks and butter knives until she bled to death. Her body was discovered later that morning after a neighbor observed her eighteen-month-old child at the trailer window covered with his mother's blood. At the time of the occurrence of her murder the victim's husband had been working off-shore and she had been alone with her child that night.
In a nearby house the defendant, David Jon Liner, lived with his wife and parents. He had spent the earlier part of that evening with the victim's brother, whom he had known for a number of years. Following this, the defendant went home where he became involved with a fight with his wife.
After the fight, the defendant departed from his home and, upon seeing Roxanne's trailer, he went over and knocked. She answered the door in her night clothes and invited him inside. She apparently rejected sexual advances made by him and, as subsequently indicated by the evidence developed, he grabbed a knife from a kitchen drawer and stabbed her repeatedly until the knife broke. After that he grabbed other kitchen instruments and continued to stab her. On the handle of the oven door the defendant's fingerprint was subsequently found and in the blood on the floor were found sneaker prints which subsequently were identified as his.
During the days which followed, the defendant and many other people were interviewed. *509 Approximately three weeks after the murder, on June 11, 1978, the defendant was again interviewed and fingerprinted. Eventually, David Jon Liner confessed in full detail to the murder. The fact that the defendant was not a major suspect at the outset and the fact that the development of the case was a gradually accumulating process, during which other individuals in the area were questioned, is a significant part of the back drop of this case.

I.

THE ISSUE OF THE DEFENDANT'S SANITY
The evidence of the State presented at the trial consisted entirely of the taped recordings made during the course of the police interviews with the defendant. These particular tapes were made over a four-day period from June 11, 1978, to June 14, 1978. In each succeeding tape the defendant related more and more honestly the details of his involvement in the murder, correcting earlier tapes and lies and adding new details and admissions.
The defense counsel's presentation of evidence of the defendant's insanity consisted of the testimony of: defendant's wife, his maternal grandfather, his father, his mother, his brother and his sister. Each of these members of his family testified that the defendant was not having an affair with Roxanna Barrilleaux. It is important to point out, however, that on cross-examination the defendant's brother and sister testified firmly that they had never thought that their brother was insane.
In addition to the foregoing, the principal witnesses presented in behalf of the defendant were Dr. Nathan Lubin, a psychologist, and Dr. Kenneth Ritter, a psychiatrist. By stipulation with the State each doctor was qualified as an expertDr. Lubin as an expert psychologist and Dr. Ritter as an expert in the field of psychiatry. Each of the two doctors affirmatively stated that he had concluded that the defendant was psychotic, a schizophrenic and paranoid type, and that he had been so for at least ten years. Dr. Lubin refused to define the defendant's mental illness in terms of the ability to discern right from wrong but he did testify that the defendant was unable to function "in the right fashion" and could not control his actions. Dr. Ritter, on the other hand, specifically found that the defendant did not know the difference between right and wrong on the night of the homicide and that he was "legally insane".
The State presented no rebuttal testimony on the sanity question after the defense rested. The defense took the position that this amounted to a failure to present any evidence to refute the contention that the defendant was insane at the time he committed the crime, as required by State v. Poree, 386 So.2d 1331 (La.1980). (On rehearing).
However, although in Poree the State did present certain rebuttal witnesses on the sanity issue, the Poree court did not find that the jury's finding of sanity necessarily had to be restricted to evidence presented on the State's rebuttal nor even restricted to evidence presented by the State. The Poree court merely held that the record must contain some evidence of sanity, capability of distinguishing right from wrong. Poree, supra, at 1339. Accordingly, it cannot herein be concludedsimply because evidence tending to indicate sanity did not surface during rebuttalthat such evidence cannot be weighed. And furthermore, this court specifically has held that all the evidence, including both expert and lay testimony and conduct and action of the defendant, should be considered by the jury in determining sanity. State v. Daigle, 344 So.2d 1380 (La.1977).
However, it must be observed that there has been some refinement of the standard of review with regard to the Poree concept of "some evidence". More precisely, the concept has been implicitly qualified by State v. Roy, 395 So.2d 665 (La.1981), in which this court applied Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to the affirmative insanity defense. The Jackson case held that due process requires the jury verdict of sanity *510 be overturned if "viewing the evidence in the light most favorable to the prosecution... the defendant established the affirmative defense of insanity by a preponderance of the evidence, and that no rational fact finder could have found him sane on the record evidence."
In Roy, supra (in Per Curiam denying Rehearing), this qualification subsequently was clarified by this court: "... When we said that Roy had proved his insanity by a preponderance of the evidence, we meant simply that, applying Jackson v. Virginia... we determined, under the facts and circumstances of the case, that a rational fact finder, viewing the evidence in the light most favorable to the prosecution, could not have concluded that defendant had failed to prove by a preponderance of the evidence that he was insane at the time of the offense. See also: State v. Hathorn, 395 So.2d 783 (La.1981); State v. Claibon, 395 So.2d 770 (La.1981), both decided this day."
An examination of the record evidence in the present case indicates that the strongest evidence of the defendant's sanity comes from his own mouth. The jury listened to approximately 100 transcript pages of the various taped interviews of the defendant talking and confessing to the police. Although Dr. Ritter testified that these tapes were not inconsistent with someone's suffering from paranoid schizophrenia, to a lay person the defendant's thought processes do not appear at all inconsistent with sanity. Following, for example, are excerpts indicating some of the defendant's own reflections upon his acts:
A "No. Just once I did itstabbed her one time. I don't know what happened. I just couldn't stop."
Q Now don't cry. It's over.
A (Unintelligible).
Q Pardon me?
A Everything thats happened to me, its not really happening to me. Its happened. Its going to take a toll on everybody else.
Q A lot of people are going to suffer, that's true. All of your friends and your wife, your family are going to suffer from this. That's very true.
A There ain't no way to get rid of me?
Q No, we can't do that. We cannot ...
A Didn't they say they was bringing the death penalty back?

(And later:)
Q Okay. David let's go back into your reason for this, can you tell me the exact reason why you did this?
(long pause)
Can you or you don't want to?
A I don't know.
Q You don't know the reason?
A Not really."
The defendant's own incomprehension of his actions was something to which the jury undoubtedly related all too well because those actions would have been equally incomprehensible to the jury, a jury which we fairly may be able to presume to have been sane. Undoubtedly, with regard to such statements on the defendant's part, to the jury's consideration was added the testimony of some of the defendant's family to the effect that they did not think that he was insane.
Furthermore, it is only reasonable to assume the jury's recognition of the series of rational moves implicit in defendant's admission to the police that after the murder he went home, put his bloody clothes in a bag, took a shower, went to bed and laundered the clothes the next day. All of this certainly constitutes some evidence of sanity.
The application in State v. Roy, supra of the Jackson v. Virginia, standard of review to the affirmative defense of insanity had the result of substituting this court's finding of insanity for the jury's finding of insanity in virtually every case involving a person who is dangerously insane. Nevertheless, in the present case it is possible to say that the defendant's extensive dialogues with the police not only describe possibly sane actions surrounding the attack by him on the victim but also reveal something *511 of his mental state for the jury's benefit. When this evidence is combined with the lay testimony to the effect that the defendant appeared sane, it may have been sufficient to overcome the evidence presented by the expert testimony of insanity, even under the State v. Roy, supra, standard of review.
Consequently, it must be concluded that there was presented sufficient evidence of sanity with regard to the defendant's state of mind. Accordingly, there is no evidence on this issue of any denial of due process with regard to the defendant. This claim of error is without merit.

II.

ADMISSION INTO EVIDENCE OF THE RECORDED CONFESSIONS
Defense counsel contends that the trial judge committed error in failing to suppress the tape recorded confessions obtained by the police, allegedly as a direct exploitation of an illegal arrest. This argument is based upon the claimed deprivation of defendant's rights under the Fourth Amendment rather than under the Fifth Amendmentwhich is to say that the claim is focused upon the alleged illegal seizure of evidence rather than upon the concept of self-incrimination. More specifically, it is argued, statements made during custodial interrogation, even though preceded by Miranda warnings, nonetheless must be excluded if the detention was not supported by probable cause and if the statements were obtained by exploitation of such illegal detention.
We are required, therefore, to view the defendant's inculpatory statements, presented to the jury, against the backdrop of events leading up to his making them. The defendant was first interviewed by police on May 22, 1978, two days after the murder. Many other people were also interviewed at the Fireman's Hall, as well as the defendant, and no notes nor recordings were made of any of these interviews. In the course of scouring the scene of the murder, police recovered a fingerprint and on the morning of June 11, 1978, the defendant was called down to the Sheriff's Office to be fingerprinted.[1]
Afterwards, Officer Froreich was assigned to the task of interviewing the defendant in order to determine whether the defendant's fingerprint could have been left in the victim's trailer innocently prior to the murder. With this objective in mind, according to his testimony, he and Officer Rogers went to the defendant's, where he lived with his parents and his wife, at approximately 6:00 p. m.still on the 11th. The defendant agreed to talk with the officers and informed them that he had been a friend of the victim's husband and had played cards in the victim's trailer possibly as recently as three weeks prior to the murder.
This conversation was recorded by the police at the defendant's home. Later that evening, the officers again sought to question the defendant and found him driving around in his car with his wife.
This time they requested that he meet them at the courthouse. When he arrived there he signed a standard pre-printed waiver of rights form. Again the defendant was questioned by Officer Froreich and on that occasion informed the police that he had been at the victim's trailer the evening before she was killed.[2] The defendant then agreed to take a voice analyzer stress-test and to allow his car to be checked by the State Crime Lab for blood. Thereafter, he returned home.
On June 12, 1978, the defendant wrote out and signed a statement to this effect, *512 once more stating that he had been in the victim's trailer briefly on the Thursday afternoon before her murder on Friday night.
On June 13, 1978which is to become the crucial day with regard to the defendant's confessionsthree police officers went to his residence and requested that he accompany them to the courthouse for further questioning. He agreed and this time was transported in the police vehicle.
The defendant again signed a waiver of rights form at the courthouse at 6:20 p. m. and the officers began interrogating him concerning the written statement, which he had made the day before. Officer Froreich accused the defendant of lying about the Thursday visit to the victim's trailer, pointing out that the victim had not been home at that time. Then the defendant broke down, crying and admitted that he had been at the trailer on Friday night, but he claimed he had arrived after the murderer and that he had found the victim already dead.
At this point the officer asked the defendant why his fingerprints were on all the murder weapons although the only print actually left by the defendant was found on the handle to the oven door. The defendant's reply was that he was so angry about what had been done to "Roxie", the victim, that he went crazy and touched everything.
It is important to observe that this first conversation of June 13th appears to be the first clearly inculpatory statement made by the defendant during the course of the investigation. Unfortunately, there is no tape recording of this statement. According to Officer Froreich, he merely took notes on this particular occasion.
By that time, as he testified at the motion to suppress hearing, the defendant had become a "target suspect". The only concrete evidence then connecting the defendant to the crime was the single fingerprint. Officer Froreich testified that the defendant still had not been placed under arrest and would have been allowed to leave if he had requested to do so.
It was later that evening at 8:25 p. m. that agent Gros arrived at the courthouse and conducted a tape recorded interview with the defendant. It was in this session that the defendant finally admitted the murder and explained in detail how it had occurred. It was at the conclusion of this interview that the defendant was placed under arrest.
Later that evening and early the next morning the defendant gave three more tape recorded statements, in which he amended and refined with additional detail his earlier confession. Counsel for the defense sought to suppress all five taped statements on the ground that they were the direct product of illegal detention of the defendant.

III.

DEFENDANT'S ARGUMENT AS TO ILLEGAL DETENTION
It is admitted in the defendant's argument that his inculpatory statements of June 13, 1978, were preceded by proper Miranda warnings and waivers with regard to Fifth Amendment purposes. However, defendant contends that, even if statements made during custodial interrogation were preceded by Miranda warnings, nevertheless they may be excluded if the detention was unsupported by probable cause and the statements were obtained by exploitation of the illegal detention. In his brief the defendant relies upon State v. Menne, 380 So.2d 14 (La.1980) and State v. Scott, 355 So.2d 231, (La.1978) to support his attack upon the admission of the confessions.
The response of the State contends that the tape-recorded confessions were not obtained through the exploitation of an illegal detention unsupported by probable cause but, to the contrary, are well within the guidelines set forth by the United States Supreme Court in Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 714, 50 L.Ed.2d 214 (1977):
"... police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement *513 of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him `in custody'. It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited."
It is the position of the State here, and this court agrees, that to the extent that one may be "in custody" under Mathiason this court has enunciated an objective standard of the "reasonable interrogee" under the totality of the circumstances as articulated by the court in State v. Menne, supra. When the objective standards of Menne are applied to the totality of the events surrounding the instant case it is clear that prior to the defendant's changing his statements from exculpatory to inculpatory statements a "reasonable interrogee" would not have a reason to feel he had been "deprived of his freedom of action in a significant way" such as to believe he was "in custody".
Roxanne Barrilleaux's body was found in the early morning hours of May 20, 1978. The Parish authorities immediately began an intensive and extensive investigation which ultimately led to the formal arrest of the defendant-appellant on the evening of June 13, 1978. During this investigation period a number of individuals, including the defendant, were interviewed by St. Mary Parish investigators.
Prior to his interrogation on June 13, 1978, by Agent Gros the defendant had been questioned both at the police station and at the residence of his parents. Each time the defendant was not prevented from walking away from those interviews. In fact, the defendant appears to have willingly cooperated in the efforts by St. Mary Parish authorities to investigate the death of the victim. The defendant relies heavily upon particular arguments in an attempt to change this general investigatory interview situation to an "in custody" interrogation under the Mathiason and Menne standards.
Defendant relies, for example, upon the fact that at trial several members of the St. Mary Parish Sheriff's Office had made statements which indicated that the defendant was a "target suspect". However, the Mathiason and Menne standard is not the state of mind of the interviewer but the state of mind of the "reasonable interviewee." Menne, supra. The fact that the interviewer made a false statement to the interviewee created an "in custody interrogation." Mathiason, supra; State v. Johnson, 363 So.2d 684 (La.1978).
The defendant also relies upon the fact that two St. Mary Parish officers affirmed under oath in preparation for a search warrant that the defendant-appellant "was picked up in connection with ..." the Barrilleaux homicide. This, however, does not go to the issue of whether the "reasonable interviewee" felt he was "in custody" at the time. It is merely a common expression used by police to indicate how an individual was transported and in connection with what matter.
The fact that defendant signed an official form stating that he was being "detained and questioned" does not in and of itself create in the interviewee's mind a sense of "in custody interrogation". The defendant signed such a form on two different occasions. On the first occasion, he was allowed by the authorities to leave. Nor is there any evidence in the record that the defendant was detained from leaving at any time following his signing of the second form prior to his being turned over to Agent Gros. Nothing in the record indicates that prior to being turned over to Agent Gros at 8:00 p. m. on the evening of June 13, 1978, any "in custody interrogation" of the defendant had occurred.
Under Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed. 824 (1979), an "in custody interrogation" must have occurred prior to the giving of Miranda warnings. Once an illegal detention has occurred, followed by a post-Miranda confession, the standards provided in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 *514 L.Ed.2d 441 (1963), must be considered to determine if the confession has been so tainted that the Fourth Amendment rights of the confession has been violated. Dunaway, supra. This court similarly held in State v. Scott, 355 So.2d 231 (La.1978). The Scott case, however, is based upon the fact that the authorities illegally detained the individual without probable cause to arrest prior to giving the confessor his Miranda warnings. In the instant case no such illegal detainment occurred.
The defendant also relies upon the cases of State v. Zielman, 384 So.2d 359 (La.1980); and State v. Giovanni, 375 So.2d 1360 (La. 1979) as precedent for excluding the confession in the instant case. These cases pertain to statements made by defendants preceding Miranda warnings. In the instant case the State made no attempt to introduce at trial statements made by the defendant prior to the Miranda warning. The tape-recorded confession was made after he was given his Miranda warning by the St. Mary Parish authorities.
A holding in the instant case that the defendant's Fourth Amendment rights had been violated would create a situation under which police would be unable to conduct face-to-face interviews during their investigation of a crime for fear that an interviewee at a later date might become a defendant. In the case at hand it is apparent that the defendant's rights were not violated under the Fifth Amendment nor was the confession tainted by prior "in custody interrogation" under the Fourth Amendment.
This assignment of error lacks merit.

IV.

ADMISSION INTO EVIDENCE OF DEFENDANT'S TENNIS SHOES
The defendant argues that the trial court erred in failing to suppress the introduction of the defendant's tennis shoes. The shoes were seized pursuant to a search warrant issued on June 13th, on the basis of an affidavit which defendant alleges was defective. In particular, it is claimed that the affidavit failed to set forth information from which it could be determined that the proffered probable cause was contemporaneous with the application.
It is well established that information contained in an affidavit must be sufficiently recent so as to justify a finding of probable cause at the time of the issuance of the search warrant. Sgro v. United States, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed.2d 260 (1932); State v. Humble, 309 So.2d 138 (La.1975).
In State v. Boudreaux, 304 So.2d 343 (La. 1974) this Court recognized that an affidavit is adequate if a common-sense construction of the face of the affidavit tends to establish that the information contained therein is correct. See also State v. Turner, 337 So.2d 1090 (La.1976).
In the present case the affidavit provided in pertinent part:
"The probable cause is based on the following: After interrogating one DAVID LINER, white male subject who was picked up in the connection with the ROXANNA BARRILLEAUX, homicide we were advised by LINER that the shoes which had left blood marks within the trailer of the victim and also on the front steps belonged to him (LINER) and that they were presently located in the storage closet at his residence in Baldwin. Subject further advised that he was at the residence around midnight of the homicide, (Friday, May 19, 1978) Liner was picked up after investigation showed that the fingerprints found in the trailer near the body of the deceased belonged to him (DAVID LINER) Liner had also given officers an alibi as to his whereabouts on the night of the murder which when checked out by officers, found to be false. PERMISSION IS GRANTED TO CONDUCT THIS SEARCH IN THE DAYTIME, NIGHT TIME SUNDAYS AND HOLIDAYS. Additional info: David Liner further advised that the shoes are hidden in a suitcase, which was placed on the rack of the storage closet (closet located near his mothers bedroom)." *515 Defendant points out that all of the foregoing facts are spelled out in the past tense and that the only date given is May 19, 1978, the date of the homicide. This affidavit was presented to the issuing magistrate on June 13, 1978; therefore it is apparent from the face of the affidavit that the information contained therein must have been received during the preceding twenty-five days after the crime was committed.
This affidavit is distinguishable from the contested affidavits in most other cases, because in this case the defendant himself was the source of the information concerning the location, in his own closet, of the tennis shoes. This is not a case, then, in which the information is received from third parties, and often involves rapidly consumable contraband, outside the control of the informant, and therefore unlikely to remain in a designated location for any extended period of time. See, State v. Huff, 392 So.2d 1046 (La.1980); State v. Ogden and Geraghty, 391 So.2d 434 (La. 1980).
On these facts it was reasonable for the magistrate to have believed that the evidence had not been disposed of but rather remained at the place to be searched at the time of the proposed search. See, State v. Lewis, 385 So.2d 226 (La.1980).
This assignment of error lacks merit.

V.

MOTION TO QUASH ON GROUND OF ILLEGAL SELECTION OF PETIT JURY VENIRE
Defense counsel's claim of error arises from the trial court's refusal to quash the petit jury venire selected for the trial of this case.
At the hearing, Mr. Robert Marrero was presented as a witness for the defendant. He testified that he had been present in the clerk's office on October 4, 1979, at 11:00 a. m. when the jury commissioners met to select the petit jury venire from the general venire list. According to this witness, jury commissioner Smardan, referring to the upcoming trial, spoke of the present defendant to the following effect: "If they don't hang that boy, they ought to shut down the courthouse."
The jury commissioners also, according to defense counsel, proceeded to select jury names in a manner which was not "indiscriminate" as required by La.C.Cr.P. Art. 416 which reads in pertinent part:
"Art. 416. Drawing petit jury venire in parishes other than Orleans; term of service.
A. Upon order of court the jury commission in parishes other than Orleans shall draw a petit jury venire. The commission shall draw indiscriminately and by lot thirty name slips from the general venire box, unless directed by the court order to draw a larger number. The persons whose names are so drawn shall be subject to serve as petit jurors for the first week of the next criminal session of court."
The defendant also called a jury commissioner of ten years, Joseph Cefalu, who described the procedure which has been consistently used to select jury venires whenever the five commissioners meet once or twice a month. The following excerpt from that testimony serves to illustrate that procedure:
Q "Then how would you then select the 20 names that you needed?
A Well, I would try to pick the percentage of the colored females, a percentage of the colored males, a percentage of the white females, and I usually pick about 30 percent of the colored, because that's about proportionate of the colored people in our parish. I try to pick on the basis of proportions of the people that live in the parish in my area.
... I can usually tell by the names if it was female, male or colored or white usually by the name. Not that a lot of them I know personally; these that I didn't know I just had to go by the names, knowing the family names. I might not know the person, but the background, where they come from ... But based upon the old *516 family names, I can tell by the native names just about what families they are and whether they are male or female, but I usually could work out pretty, pretty close.
Q ... If you had to pick 7 coloreds and there's 20 of those there, you would just pick the 7 that you wanted and the other 13 were just not picked?
A Not the ones that I wanted, no. Particularly I would try to pick the ones that I thought would make good jurors, too.
Q You say that one of your criteria for a petit juror is the educational background of the individual?
A Well, I think that would have something to do with it, if I had to make a decision. Not necessarily. That's not necessarily always true. I know a lot of people with no education would make real good jurors. It depends on the person. I think that's the whole criteria, trying to get a fair representation."
One hundred and fifty names were thus selected from the general venire of St. Mary Parish. The State concedes that the procedure used was not in exact accordance with the indiscriminate method prescribed by La.C.Cr.P. Art. 419 which reads, in pertinent part:
"A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced or some great wrong committed that would work irreparable injury to the defendant."
The jurisprudence allocates to the defendant the burden of establishing fraud or that some irreparable injury was caused by the selection process. State v. Sheppard, 350 So.2d 615 (La.1977); State v. Larue, 324 So.2d 384 (La.1975).
The good faith of the testifying Jury Commissioner, Cefalu, is apparent from the record. However, the defendant argues that the comment allegedly made by Commissioner Smardon "If they don't hang that boy, they ought to shut down the courthouse," is sufficient to demonstrate a clear prejudice on the part of at least one of the other four commissioners and upon the presentation of this evidence the burden originally should have shifted to the State to rebut the charge that a "hanging jury" venire had been selected by that commissioner.
However, on its cross-examination of Commissioner Cefalu, the State made sufficient progress in discrediting this defense allegation. Cefalu testified that he did not hear Smardon make such a remark, although he was seated next to him. He further testified that the commission is never informed of what case or cases the selected venire will be trying.
It does not, therefore, appear that the trial court abused its discretion by ruling that the defendant had failed to carry the burden of proof required under La.C.Cr.P. Art. 419.
This assignment of error, consequently, lacks merit.

VI.

DEFENDANT'S CONTENTION OF BREACH OF SEQUESTRATION
The defendant argues that the trial court erred in denying his motion for a mistrial on the ground that the sequestration of the jurors had been breached in violation of La.C.Cr.P. Art. 791. That article reads in pertinent part as follows:
"A jury is sequestered by being kept together in charge of an officer of the court so as to be secluded from outside communication. In capital cases, after each juror is sworn he shall be sequestered."
During the voir dire portion of the trial, THE COURT TOOK A FIFTEEN MINUTE RECESS. iN the course of that fifteen minutes the six already-sworn jurors commingled in the jury's deliberation room with five potential jurors who had been sitting in the jury box in the process of being examined.
When the jurors and potential jurors were returned to the jury box, the defense attorney then moved for a mistrial. The *517 judge denied the motion finding that there had been no showing of prejudice to the defendant caused by this technical violation of the codal article.
The defendant argues that in State v. Parker, 372 So.2d 1037 (La.1979) this Court held that, in capital cases especially, a presumption of the misconduct arises and reversible error will be presumed for the separation of a juror after he is sworn. In Parker, supra, at 1038, the Court, however, went on to hold:
"This jurisprudential rule is, however, limited by those cases holding that where circumstances are such as to reasonably overcome the presumption of prejudice and where it affirmatively appears that no prejudice to the accused could have resulted, the presumption may be rebutted, so that the mere separation of a juror briefly may be held to be insufficient ground to set aside a verdict. State v. Quincy, 363 So.2d 647 (La.1978); State v. Sheppard, 350 So.2d 615 (La.1977); State v. Smith, supra."
In the present case, the circumstances of the separation indicate that no prejudice to the accused could have resulted. The purpose of La.C.Cr.P. Art. 791 is to insulate the jurors from outside influences. This brief contact with four prospective jurors can not be considered an "outside communication" within the meaning of that phrase under this article.
This assignment of error lacks merit.
Finding no reversible error in this case, we affirm the conviction and sentence.
AFFIRMED.
CALOGERO, J., concurs and assigns reasons.
MARCUS and BLANCHE, JJ., concur.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
Defendant showed no signs of erratic behavior or gave any other indication that he could not distinguish right from wrong, either before the crime or during the period of more than three weeks between the crime and his arrest. Moreover, defendant's own statements make it evident he knew at the time of the crime that what he was doing was wrong.
NOTES
[*] Judges Garrison, Chehardy, and Barry of the Court of Appeal, Fourth Circuit, participated in this decision as associate justices ad hoc, joined by Associate Justices Calogero, Marcus, Blanche, and Lemmon.
[1] It is unclear from the record why the defendant, specifically, was fingerprinted. Apparently, the defendant consented to the fingerprinting because no objection is raised in defendant's brief concerning this. Cf., Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).
[2] Officer Froreich testified that this statement was also recorded. However, no transcript appears in the record before this court. (Vol. VI, p. 28).