409 So.2d 593 (1982)
STATE of Louisiana
v.
Edward Lee GIOVANNI, Jr.
No. 81-KA-1218.
Supreme Court of Louisiana.
January 25, 1982.
Rehearing Denied February 19, 1982.[*]
*595 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Leonard K. Knapp, Dist. Atty., Charles W. Richard, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
D. Michael Mooney, and Carl A. Leckband, Jr., Lake Charles, for defendant-appellant.
JIM GARRISON, Justice Ad Hoc.[**]
Edward Lee Giovanni, Jr., the defendant, was charged with three counts of first degree murder for the killing of Paul Terry Prejean, Margaret Ellen Prejean and Jessie Paul Prejean on or about September 2, 1978, in violation of La.R.S. 14:30. A true bill was returned by the Calcasieu Grand Jury against the defendant on October 5, 1978. On November 4, 1980, the jury found the defendant guilty as charged on all three counts and on November 5, 1980, the jury recommended that the defendant be sentenced to life imprisonment. After denying the defendant's motion for a new trial, the trial judge sentenced the defendant to three terms of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The terms of imprisonment on counts one and two were directed to run concurrently and the term on count three to run consecutively with regard to counts one and two. The defendant has appealed his conviction and has argued each of nine assignments of error.
On September 2, 1978, at some time between midnight and 2:20 a. m., the Prejean family was murdered in their home located in Carlyss, Louisiana. Paul Terry Prejean and his wife, Margaret Ellen Prejean, were definitely shot in the head and their infant son, Jessie Paul Prejean, may also have been shot, although that has not been clearly established. In any case, their house was then set ablaze, having the effect of carbonizing the three bodies inside. A light-colored small-sized car, fitting the description of the defendant's light blue Javelin, was seen leaving the Prejean premises even while it was still ablaze. A man fitting the defendant's description was seen shortly afterwards at a well-lighted car wash in town, washing out the inside of a light blue, small-sized car.
The fire at the Prejean residence was reported at approximately 2:20 a. m. and *596 was extinguished after 3:00 a. m. When the fire department arrived they noticed that Terry Prejean's dump truck was on top of an old pickup truck, apparently having been backed across the pickup truck. The headlights of the dump truck were still on and the driver's side was open. There were deep tire tracks, 30 to 40 feet in length, on the wet grass on this side of the house. Pieces of rope were also found in this vicinity. It appeared that the dump truck was used to pull out a small-sized car which became stuck in the wet grass on the side of the house.
Fire and police investigators worked throughout the day collecting and developing evidence from the scene of the fire. The defendant was questioned about the fire by officers Ogea and Hoffpauir of the Calcasieu Parish sheriff's office on the day of the homicides. The defendant informed Ogea that he had been staying with the Prejeans. However, the defendant claimed to know nothing about the fire and stated that he did not return to the Prejeans' after he and the Prejeans left the Grangers' that evening around midnight. In response to Ogea's comment that Terry's dump truck was not where it was supposed to be, the defendant stated that earlier that afternoon he had helped Terry move a white Dodge Colt automobile which Terry had just sold, but that Terry was "real high" (meaning on drugs) and consequently left the dump truck parked on top of a pickup truck.
The murders appear to be drug related. Terry and Margaret Ellen Prejean apparently sold marijuana in fairly large quantities. The defendant was an acquaintance of the Prejeans' for quite some time and appears to have been associated with them in their marijuana dealings. However, there is no direct evidence that the Prejeans bought their marijuana directly through the defendant.
A reconstruction of the events beginning Friday evening, September 1, 1978, reveals the following: The defendant was staying with the Prejean family that evening. Kenneth and Cindy Godeaux brought their little girl with them to visit the Prejeans somewhere between 6:30 and 7:00 p.m. Neither remember seeing a white Dodge Colt which Terry Prejean owned and both remember seeing Terry's dump truck parked in front of the house, as usual. The defendant had taken some "Demerol" that evening and had sold Kenneth Godeaux a tablet of Demerol. Apparently nearly everyone smoked marijuana that night.
Terry Prejean appears to have been apprehensive that evening for a number of reasons. Terry was concerned why the defendant was at his house two weekends in a row because the defendant, Giovanni, usually came up from Houston only every other weekend. Terry's concern was heightened because he knew the defendant had recently stolen 150 pounds of marijuana from the same source in Houston who supplied the Prejeans with their marijuana. This same supplier was expected at the Prejeans that weekend to collect $10,000.00 from Terry for the marijuana which had been advanced to him a week earlier. The Prejeans counted the money from that week's sales and came up with $2,660.00, which Terry placed in his front pocket. The Prejeans were, therefore, short more than $7,000.00.
At approximately 8:00 p. m., Kenneth and Cindy Godeaux left the Prejean premises while the Prejeans and the defendant went to visit James Scott Granger at his girlfriend's house. They remained there for three or four hours drinking beer, eating pizza and smoking marijuana. At approximately 11:00 p. m. the Prejeans left the home and the defendant left shortly thereafter. Just before the defendant left he complained to James Granger that he thought Terry Prejean had stolen some marijuana from him and he asked Granger if he knew where he, the defendant, could buy a gun.
When the defendant was arrested he was initially placed in the same cell with an old friend from the street, Joseph Maney Gaspard, Jr. Gaspard testified that while they were incarcerated together the defendant confided that he indeed had committed these murders. The defendant allegedly, according to Gaspard, related the following *597 details of the murders: The defendant was acting as the collection agent on a drug deal; he used both a shotgun and a .22 calibre revolver to kill the victims; he burned down the house with gasoline; he threw one of the guns in the river; and he mentioned something about a pickup truck. It is to be noted that Gaspard's testimony was contrary to his earlier testimony that the defendant related nothing about the murders to him. Gaspard subsequently claimed that he changed his earlier testimony because the district attorney transferred him from Angola to the Calcasieu Parish Rehabilitation Center for his own protection and promised not to object to his early parole.
In addition, at trial, Cindy Godeaux identified large bags of marijuana and a Mary Gin[1] as resembling items which she had seen at the Prejeans' that evening and the previous night. These items were recovered from an old, abandoned refrigerator on property adjacent to the residence of the defendant's father on September 12, 1978, pursuant to a search warrant. A fingerprint from Margaret Ellen Prejean and one from the defendant were lifted from the items recovered from the refrigerator.
Some confusion as to the identity of the corpse thought to be that of Terry Paul Prejean was evident. Tests of fluids from his body revealed blood type AB where both of his parents had blood type O, arguably a scientific inconsistency. However, an oral surgeon positively identified X-rays of the victim's teeth as matching those of Terry Paul Prejean.

ASSIGNMENT OF ERROR WITH REGARD TO THE RIGHT TO A SPEEDY TRIAL
The Calcasieu grand jury indicted the defendant for murder on October 5, 1978. The defendant was found guilty at trial on November 4, 1980. Consequently, one of the most important of the defendant's assignments of errors would be that made with regard to his right to a speedy trial.
The defendant was initially arraigned on October 16, 1978, at which time the court allowed the defendant's attorney to withdraw, and appointed D. Michael Mooney as defense counsel, refixing arraignment for October 23, 1978. On October 23, 1978, defendant pleaded not guilty and not guilty by reason of insanity and moved that a sanity commission be granted. The court granted defendant's counsel's motion, deferring fixing a trial date, and set November 15, 1978, for defendant's sanity hearing. At this time, defense counsel requested additional time to file motions. On October 24, 1978, the court granted the state's motion to refix the sanity hearing for November 22, 1978.
On October 31, 1978, the trial court entertained defendant's discovery motion, a motion for a bill of particulars and motion to quash the indictment. On November 22, 1978, the sanity hearing was conducted and defendant was found mentally competent to stand trial. On January 9, 10 and 11, 1979, the defendant's motion to suppress was tried. The trial court denied defendant's motion and defendant's counsel thereupon applied to this court for writs, which were granted.
On October 8, 1979, this court issued its opinion reversing the trial court's denial of the motion to suppress and remanded the case for further proceedings. 375 So.2d 1360. On December 14, 1979, the trial court heard and granted, in part, defendant's motion to suppress physical evidence and motion to suppress inculpatory statements. Defense counsel therein indicated his intention to again apply to this court for writs, contesting the trial court's determination not to suppress items of evidence found adjacent to but not located on defendant's property. (However, the record does not reflect that defendant applied for these writs.)
*598 On March 19, 1980, the defense counsel filed a motion for a preliminary examination, a petition for a change of venue, and a motion for a speedy trial. On March 26, 1980, the trial court heard and denied defendant's motion for preliminary examination and took under advisement defendant's petition for a change of venue. The minutes do not reflect any ruling on defendant's motion for a speedy trial. However, on April 7, 1980, the district attorney indicated that the trial was set for that day. This would seem to support the defendant's position that the trial court granted defendant's motion for a speedy trial and ordered the trial set for April 7, 1980. It was on April 7, 1980, that the district attorney nolle prosequied the defendant's indictment because of what he claimed was an apparently fatal weakness in the state's case concerning newly discovered evidence with regard to a discrepancy in the victim's blood type.
The defendant was then reindicted on May 9, 1980, and arraigned on May 12, 1980. The trial court set May 20, 1980 for a hearing on the motions for discovery but subsequently granted the state a three-day continuance until May 23, 1980, to answer the motion, deferring the fixing of the trial date. On June 30, 1980, the trial date on this matter was fixed for October 20, 1980. On October 14, 1980, the court denied defendant's motion for a change of venue and on motion of the state refixed the trial date for October 27, 1980. The trial actually began on October 27, 1980.
In summary, there were a number of reasons for the delay: Defense counsel's request for the appointment of the sanity commission, his filing of the motion to quash and his applying to this court for writs would seem to account for at least twelve months of the 25-month delay between the first indictment and the trial in the present case. None of the delays attributable to the state were extraordinary or capricious. None of them appeared to be deliberate on the part of the district attorney nor designed to hamper the defense. None appeared to be due to the negligence on the part of the court or the prosecution or others charged with responsibility of providing a speedy trial. All of the delays appeared to be legitimate and recognized grounds for the continuances granted. Consequently, this assignment of error appears to be without merit.

ASSIGNMENT OF ERROR WITH REGARD TO TRIAL COURT'S REFUSAL TO SUPPRESS STATEMENTS MADE BY JOSEPH MANEY GASPARD
Here, defense counsel argues that the trial court erred in refusing to grant defendant's motion to suppress the statements made to the defendant by Gaspard. Defense counsel contends that these statements should have been suppressed in the second indictment under the doctrine of collateral estoppel, since the trial court ruled that they be suppressed under the first indictment. The trial court indicated that he refused to allow the suppression of these statements carried over under the new indictment because there had never been a hearing on the merits of the motion to suppress. The judge also indicated that the defendant never did thereafter move to suppress statements made by Gaspard, as he might have done.
Indeed, it does not appear that the merits of this motion to suppress ever reached the point of a hearing. The defense counsel did attempt to take writs to this court relative to the denial of the motion to suppress the statements of Gaspard, during the course of the first indictment, but this writ application was denied. With regard to the second indictment it does not appear that the defense counsel ever attempted to argue the merits of this motion. Rather, the defense counsel, during the pre-trial proceedings of the second indictment, at trial and on appeal, appears to rely on the doctrine of collateral estoppel to carry over the suppression of the Gaspard statements to the second indictment.
It does appear, on the merits, that these alleged oral inculpatory statements were properly admissible. Although defendant allegedly made these statements after he *599 was illegally arrested, the statements were made to a fellow inmate as well as to law enforcement authorities. The inmate was not planted in the jail by authorities and it does not appear that the defendant made these statements under the influence of fear or duress. On the contrary, the defendant appears to have been confiding in an old friend from the street. It appears that the only reason these statements were originally suppressed was because Gaspard initially refused to testify in this matter. These statements do, indeed, appear to be voluntary and spontaneous admissions to a co-inmate and acquaintance and therefore sufficiently attenuated from the initial arrest to be admissible. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); and Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
This assignment is without merit.

ASSIGNMENT OF ERROR WITH REGARD TO THE TRIAL COURT'S REFUSAL TO SUPPRESS PHYSICAL EVIDENCE
Here, defense counsel argues that the affidavit in support of the search warrant is insufficient because it is based on statements made by the defendant during the course of an illegal arrest and detention. The defense counsel contends that the state impermissibly sought to establish probable cause to illegally obtain evidence. The subsequent search is therefore claimed to be warrantless and unreasonable.
The state, on the other hand, argues that the magistrate did have sufficient probable cause to issue the warrant, apart from any illegally obtained confession which might have come from the defendant, and contends that the defense counsel failed to fulfill his burden of proving otherwise because the affidavit for the warrant is not included in this record. The state next distinguishes the grounds for suppressing the defendant's confession (lack of probable cause to support the defendant's arrest) from a valid basis upon which to issue a search warrant. The state, therefore, submits that the search warrant is not rendered invalid merely because of the lack of probable cause to make an arrest of the defendant.
Trial Judge Henry L. Yelverton indicated, in his per curiam, that the defendant requests only that the favorable portion of Judge Planchard's previous ruling on the motion to suppress in the first indictment be recognized in the second indictment. Judge Yelverton, therefore, reasoned that the issue was not raised in the second indictment since the motion to suppress evidence not suppressed in the first indictment was never renewed in the second indictment.
A review of the record indicates that Judge Yelverton was correct in ruling that the defendant never raised this issue under the second indictment. Under the first indictment, on December 14, 1978, Judge Planchard, for oral reasons assigned and not in this record, made the following ruling on the defendant's motion to suppress physical evidence. All items found on the property at 1224 Giovanni should be suppressed, but all items seized and found on the property adjacent thereto and in the wooded area in the refrigerator could be used as evidence in this case. Defense counsel thereupon indicated his intention to apply to this court for writs. However, on July 31, 1980, after the district attorney nolle prosequied the first indictment and the defendant was reindicted, it appears that the defense counsel moved only to suppress all evidence that was suppressed under the first indictment.
On August 8, 1980, Judge Planchard ruled that all matters heard by this court would stand, but denied the defendant's motion to suppress. Defense counsel objected to Judge Yelverton's ruling and applied to this court for writs. However, this court denied the writ application. Regardless, the defense counsel never appeared to re-urge his argument that items seized from property adjacent to the property located at 1224 Giovanni Street should also be suppressed.
*600 The present prosecution is based upon the Bill of Information filed on May 8, 1980. No motion to suppress evidence seized from property adjacent to 1224 Giovanni was ever filed under the second indictment.
Even so, the merits here do not appear to aid the defense. A transcript of the hearing on the original motion to suppress, December 14, 1980, does not appear in the present record. An examination of the warrant application executed on September 12, 1978, indicates that the affidavit was based almost entirely upon statements taken from the defendant on September 10 that this court then ordered suppressed. The ruling of Judge Planchard suppressing all items taken from the house therefore appears wholly correct.
However, the remaining items not suppressed were the two bags of marijuana seized from an "abandoned" refrigerator and later found to bear the finger prints of Margaret Ellen Prejean and defendant. According to the trial testimony of Officer Tom Harless, the refrigerator was located "approximately ... oh, three yards from what I considered the property line of the Giovanni residence, to the west of the Giovanni residence." The refrigerator was discovered at the foot of a tree by Elbert Welborn, employed at the time as a supervisor for the State Fire Marshall's Office. Welborn described the area as "... a wooded lot that's grown up in trees and bushes...." The refrigerator was tipped on its side, Welborn testified, and the front door was missing. Easily viewed inside were the two white garbage bags which were found to contain marijuana and later yielded the incriminating sets of fingerprints.
On this record, it seems certain that defendant had no reasonable expectation of privacy in the refrigerator, as it lay outside the boundary of his property and was otherwise open to the view of anyone who passed by. Although the officers may have been technically trespassing on defendant's property because the warrant they carried was invalid, their seizure of the marijuana bags thus violated no interest of defendant under the Fourth Amendment, or La.Const. 1974, Art. 1, § 5. See State v. Dupuis, 378 So.2d 934 (La.1979). In denying the motion to suppress in this regard, Judge Planchard thus specifically noted that "(t)here was no evidence to show the Court that there was any control over ... this piece of property by the Giovannis, so there was no right of privacy which could be invaded ... the court is not going into the open field doctrine, nor the abandonment doctrine completely, but I feel that probably either one can be analogous to this situation."
This assignment of error lacks merit.

ASSIGNMENT OF ERROR WITH REGARD TO THE TRIAL COURT'S ALLOWING JIMMY GODEAUX TO TESTIFY BECAUSE THE DEFENSE WAS NOT NOTIFIED IN ADVANCE BY THE STATE PURSUANT TO DISCOVERY
The defense counsel contends that at least three weeks prior to trial the state and Godeaux reached an agreement by which the state would drop pending distribution charges against Godeaux in exchange for his testimony in the present case, yet defense counsel, he further contends, was notified of this only immediately before Godeaux took the stand.
The trial court's per curiam indicates that defense counsel was notified that Godeaux would testify one week prior to trial and that Godeaux was not offered immunity from prosecution on the outstanding charge until the night before he was called to the stand. Inasmuch as the state supplied this information to defense counsel on the following morning, the trial judge complied with its discovery obligation insofar as the offer and arrangements with this witness were made known as soon as they materialized.
During the course of the trial, on the morning of November 3, 1980, the state filed a "Notice of Intent of Exculpatory Evidence in Possession of District Attorney," relative to an offer to dismiss pending charges against Jimmy Godeaux if he would cooperate and testify truthfully in the present case. This notice was filed immediately before Godeaux was called to *601 the stand to testify and defense counsel objected thereto on the grounds that the state had failed to timely notify him of this exculpatory evidence. The prosecutor thereupon informed the court that the offer to dismiss the pending charges against Godeaux was communicated to him only the prior evening; that Godeaux was then in Corpus Christi, Texas, with an outstanding arrest warrant against him; and that Godeaux's wife was informed that this offer would only stand if Godeaux immediately returned to testify in the present case. Based upon these representations, the trial court allowed Godeaux to testify over defense counsel's objections.
On redirect examination Godeaux testified that he never actually received a subpoena to testify in this trial and was not sure that the state was ever going to use him. Defense counsel thereupon motioned for a mistrial and that the charges be dismissed for prosecutorial misconduct on the basis that the state "cut the deal with Godeaux three weeks ago." The state responded that it was not until the previous night that it decided to call Godeaux to testify. Since the offer to dismiss the pending charges against Godeaux was contingent upon his truthful testimony and the state was uncertain as to whether Godeaux would ever testify, this alleged exculpatory evidence might never become relevant.
It is uncontested that the state gave defense counsel Godeaux's name as a possible witness a week prior to trial. Any bias or prejudice with regard to the state's offer of immunity could only become relevant for impeachment purposes if the subject testified, a matter not clearly known to the prosecution until the day before his testimony. Moreover, the defense counsel, through his cross examination, clearly made the jury aware of the possible bias of this witness. The impeaching material was therefore effectively presented to the jury and counsel has not demonstrated how the last minute disclosure of the immunity grant to the witness hampered the cross examination of Godeaux with regard to his interest in the case.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR WITH REGARD TO THE TRIAL COURT'S REFUSAL TO GRANT A MISTRIAL BASED ON REFERENCE IN TESTIMONY TO THE SHOTGUN RECOVERED FROM THE GIOVANNI RESIDENCE
The defense counsel contends that it was insufficient for the trial court to merely sustain his objection to this portion of Deputy Harless's testimony because it would be virtually impossible for the jurors to ignore such a reference to a .12 gauge shotgun, given the fact that there was medical testimony that the victims were shot with such a shotgun and that defense counsel in his opening statement emphasized that a murder weapon was never recovered.
The state submits that the reference to the shotgun was of little moment because no evidence was ever offered that the shotgun was the murder weapon and no shotgun was ever introduced into evidence. Therefore, it reasons that the defense counsel's choice for urging any error through his cross examination instead of an admonition from the judge was sufficient under the circumstances.
The trial judge, in his per curiam, reasoned that the reference to the .12 gauge shotgun was inadvertent and the fact that this weapon had been suppressed in an earlier proceeding was unknown to this witness. He noted that defense counsel's cross examination established that this was not the murder weapon and that defense counsel requested this procedure in lieu of admonition. It is apparent that, in the total context of the circumstances, no prejudice was suffered by the defendant here.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR WITH REGARD TO THE TRIAL COURT'S DENIAL OF DEFENDANT'S MOTION FOR A CHANGE OF VENUE DUE TO PREJUDICIAL PRE-TRIAL PUBLICITY
In this regard the defense counsel contends that the said pre-trial publicity combined *602 to make an environment in which it was impossible for the defendant to receive a fair trial. Specific incidents of the alleged pre-trial publicity included: The controversy surrounding the defendant's initial arrest; the suppression of certain statements made by him; the suppression of evidence found in his home; the medical bills which he ran up and which were charged to the parish; the subsequent dismissal of the charges against him; and his later re-indictment on the same charges. The state has responded that the defendant has failed to establish such prejudice as would deny him a fair and impartial trial.
The defendant's motion for a change of venue was tried and submitted on October 10, 1980. On October 14, 1980, after hearing the testimony of witnesses and arguments of counsel and reviewing the exhibits offered into evidence, Judge Patin denied the defendant's motion.
As Judge Patin pointed out, this case was an unusually newsworthy one due to the nature of the offense charged and the sequence of events which followed the initial charges. However, while there were numerous articles and television pictorial and news reports, the court found from the evidence submitted that none were inflammatory in nature and that there did not exist such prejudice, undue influence or other reasons which would affect the answers of jurors on the voir dire examination, or the testimony of witnesses at the trial.
Grounds for a motion to change venue are provided in La.C.Cr.P. art. 622. Under this article the defendant must prove more than mere knowledge of public facts surrounding the offense to be entitled to have his trial moved to another parish. The burden of proof is on the defendant to show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. State v. Adams, 394 So.2d 1204 (La.1981); State v. Felde, 382 So.2d 1384 (La.1980); State v. Sonnier, 379 So.2d 1336 (La.1979), on rehearing, 379 So.2d 1368 (La.1980); State v. Matthews, 354 So.2d 552 (La.1978); State v. Sheppard, 350 So.2d 615 (La.1977). It is well established that whether the defendant has made the requisite showing is a question addressed to the trial court's sound discretion.
The subject articles complained of here, which were produced from the media, were mainly factual accounts rather than prejudicial. The trial court's ruling denying a change of venue, accordingly, was proper and well within its discretion.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR WITH REGARD TO THE TRIAL COURT'S HAVING ALLOWED THE PROSECUTOR TO MENTION ALLEGEDLY AGGRAVATING CIRCUMSTANCES IN HIS OPENING STATEMENTS WHICH ALLEGEDLY WERE NOT PROVED AND WHICH WERE NOT GIVEN TO DEFENSE COUNSEL PRIOR TO TRIAL AND THE STATE'S NOTICE OF INTENT
The state's response to this contention is that the defendant waived any error which might have occurred because no contemporaneous objection was made to the opening statement. The trial judge, in his per curiam, suggests that the district attorney's opening statement contained a correct and permissible recitation of the applicable law and cautioned the jury that the only evidence to be considered was that given by witnesses and apparent from exhibits.
A review of the record reveals that the trial judge was correct and well within his discretion. The prosecutor does not appear to have acted in bad faith with regard to any of his remarks. Nor does it appear that the defendant was in any way whatsoever prejudiced by them.
This assignment of error is without merit.

ASSIGNMENT OF ERROR WITH REFUSAL ON THE PART OF THE TRIAL COURT TO GRANT A MOTION FOR A NEW TRIAL
The defense counsel bases this assignment essentially on the text of his motion *603 for a new trial, the other assignments of error argued herein and the totality of circumstances surrounding this particular case which allegedly created a hostile and prosecution prone atmosphere. The state submits that no new issues were raised regarding the said motion for a new trial and that a new trial would not produce a different result than the verdict reached.
The trial judge, in his per curiam, indicated that he denied the motion because it did not present any circumstances or arguments that had not been previously submitted during the trial of the case.
To the same extent, this assignment of error does not present any circumstances or arguments not previously submitted. The trial judge was clearly correct and well within his discretion in refusing to grant a motion for a new trial.
This assignment of error is without merit.

ASSIGNMENT OF ERROR TO THE EFFECT THAT THE VERDICT WAS CONTRARY TO THE LAW AND THE EVIDENCE
This is an extremely general assignment of error which is simply not supported by a review of the evidence and the applicable law. The jury had sufficient basis upon which to arrive at its verdict beyond a reasonable doubt. A rational trier of fact in this case could well have concluded that the defendant murdered the three victims.
This assignment of error is without merit.

* * * * * *
For the foregoing reasons, the convictions and the sentences in this case are affirmed.
AFFIRMED.
CALOGERO and MARCUS, JJ., concur.
NOTES
[*] Lemmon, J., concurred in the denial of rehearing.
[**] Judges James C. Gulotta and Jim Garrison of the Court of Appeal, Fourth Circuit, and Bernard J. Bagert of the Criminal District Court, Parish of Orleans, participated in this decision as Associate Justices ad hoc, joined by Chief Justice John A. Dixon, Jr. and Associate Justices Pascal F. Calogero, Jr., Walter F. Marcus, Jr. and Fred A. Blanche, Jr.
[1] A Mary Gin is apparently some mechanical device which separates the stems and seeds in marijuana from the leaves.