418 So.2d 1306 (1982)
STATE of Louisiana
v.
Christopher J. REBSTOCK.
No. 82-K-0910.
Supreme Court of Louisiana.
June 21, 1982.
Rehearing Denied September 17, 1982.
*1307 Jacob J. Amato, Jr., Gretna, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., for plaintiff-respondent.
WATSON, Justice.
Defendant, Christopher J. Rebstock, a sixteen year old juvenile, is charged with the second degree murder of twelve year old Lara Deutsch. LSA-R.S. 14:30.1. The trial court denied a motion to suppress his confessions, and a writ was granted to review the ruling. 413 So.2d 510 (La., 1982).

FACTS
On January 10, 1982, Detectives Buras and Hiddings of the Jefferson Parish Sheriff's office were investigating the murder of Lara Deutsch. She had not returned home after visiting the Rebstocks' residence. An obscene phone call about a dead girl had also been traced to that residence.[1] The victim's family gave information which focused the investigation on Christopher Rebstock. He was the prime suspect. About 4:00 o'clock on January 11, the two detectives went to the Rebstock residence. Earl Rebstock answered the door. He and his wife had been up all night because of Lara, a close friend of their daughter. Both were described as being in a state of shock. The detectives said they had evidence leading toward Christopher and wanted to question him.
Earl Rebstock said he mentioned calling attorney Bob Evans, a neighbor, but was told legal help would entail search warrants, subpoenas and an "ugly scene". (Tr. 99) Also, according to Rebstock, one detective said: "Mr. Evans does not do that kind of work. He works for the Parish at this time." (Tr. 99) Although Rebstock said the detectives discouraged him from calling a lawyer, he admitted that he could have called one anyway. Detectives Buras and Hiddings said neither the idea of an attorney nor the name of Bob Evans was mentioned.
Mr. and Mrs. Rebstock and their son rode to the detective bureau in Hiddings' police car. Earl Rebstock testified that they had no choice in the matter and had to go with the officers. He "... did not think that there was any option...." (Tr. 116) Neither officer advised the Rebstocks of their constitutional rights or informed them that they could refuse to go to the detective bureau.
When they arrived, Christopher was placed alone in Hiddings' office, and the officers informed Mr. and Mrs. Rebstock of the information incriminating Christopher. Mr. Rebstock started crying and Mrs. Ann Rebstock became too hysterical to stay in the building. She went outside with Lieutenant Claverie. Ann Rebstock had not realized until then that her son was a suspect. She said her son seemed almost "in a transe (sic)" that day. (Tr. 147) Detectives Buras and Hiddings testified that Mr. Rebstock requested a private conversation with Christopher, while Mr. Rebstock testified that the officers suggested he talk to his son.
After a short time alone with his son, Mr. Rebstock emerged from the office and stated: "He just told me he killed Laura [Lara]." (Tr. 77) Christopher was formally placed under arrest for murder.
Mr. Rebstock and Christopher agreed that Christopher would give a statement. Detective Buras started reading a rights form to Christopher and his father at 5:30 P.M. Although Christopher signed an acknowledgement that he had read his rights, he refused to sign a waiver of those rights. His father would not let him sign that part of the form, because "... his son did not know what he was doing." (Tr. 73)
Christopher went to a psychologist at one time because of school trouble. At the police station, he told his father:
"... `You know, dad, I can't go back to De LaSalle. You know, I am going to *1308 have to go to school somewhere else.'..." (Tr. 125)
Earl Rebstock did not think his son understood the enormity of the situation. Despite Christopher's failure to waive his rights, a recorded confession was taken on the advice of Lieutenant Claverie. The statement began at 5:46 P.M.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends that he was arrested when the officers brought him to the detective bureau; that the illegal arrest was made without probable cause or a warrant; and that all evidence obtained as a result is tainted.
A confession or inculpatory statement, which is the direct result of an illegal arrest, should be suppressed. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 441 (1963); State v. Edwards, 375 So.2d 1365 (La., 1979); and State v. Giovanni, 375 So.2d 1360 (La., 1979).
At the latest, Christopher Rebstock was under arrest when he was placed in Hiddings' office. He remained there alone for approximately forty-five minutes. Christopher could not reasonably have believed himself free to leave the police station.[2]State v. Menne, 380 So.2d 14 (La., 1980). He was effectively deprived of his freedom of action. State v. Giovanni, supra. Compare Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The investigation had focused on Christopher and he was in custody. However, there was probable cause for the arrest. It was not illegal. LSA-C.Cr.P. art. 213(3).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
As argued in this assignment, the trial court clearly erred, perhaps inadvertently, in finding that Miranda rights were given at the Rebstock home prior to the trip to the detective bureau. Defendant was not informed of his constitutional rights until after he had been formally placed under arrest.
This assignment has merit.

ASSIGNMENT OF ERROR NUMBER THREE
It is contended that questioning of Christopher should have ceased when Mr. Rebstock spoke of calling a lawyer on behalf of his son. Interrogation must cease when an attorney is requested. State v. Rodrigue, 409 So.2d 556 (La., 1982); Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
The trial court made a factual finding that there was no request for counsel. The evidence was conflicting and the trial court's factual finding has support. The trial court did not err in finding that counsel was not requested.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
This assignment concerns the admissibility of the inculpatory statement made by Christopher to his father, before Christopher was advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Counsel for defendant argues that the questioning by the father as an agent of the police violated the son's constitutional rights.
Regardless of who suggested the encounter between Christopher and his father, Earl Rebstock voluntarily undertook to question his son. There is no question that Christopher was his primary concern. Although Christopher was in custody at the time of the conversation, the police had not yet talked to him. The brief conversation with his father was not an extension of police interrogation. "`Interrogation', as conceptualized in the Miranda opinion, must reflect a measure of compulsion about and beyond that inherent in custody itself". *1309 Rhode Island v. Innis, 446 U.S. 291 at 300, 100 S.Ct. 1682 at 1689, 64 L.Ed.2d 297 at 307. Since Christopher and his father had a short private conversation, free from the presence of the police, he was not subjected to interrogation as defined in Miranda, supra. State v. Rodgers, 251 La. 953, 207 So.2d 755 (1968). The statement is admissible.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FIVE
The question raised by this assignment is whether Christopher waived his constitutional rights before making his recorded confession.
The prosecution has the burden of proving that a defendant has waived his constitutional rights. Tague v. Louisiana, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980). An implicit waiver can suffice. North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).
Christopher did not confer privately with his father after being advised of his rights. State in the Interest of Dino, 359 So.2d 586 (La., 1978) requires a "meaningful consultation", 359 So.2d 594, and it is doubtful that one took place here. Christopher confessed his commission of the crime, but, on the advice of his father, expressly refused to waive his constitutional rights. Compare State v. Hudson, 404 So.2d 460 (La., 1981) where the juvenile signed a waiver of his rights.
"... Miranda v. Arizona clearly stated the principles that govern once the required warnings have been given.
"`If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. Illinois, 378 U.S. 478, 490, n.14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), ...' 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694." Tague v. Louisiana, 444 U.S. at 470, 100 S.Ct. at 653, 62 L.Ed.2d at 625 (1980).
Despite the lack of a written waiver, proof of the waiver of constitutional rights can be established by other evidence. State v. Lewis, 315 So.2d 626 (La., 1975). However, "[T]he courts must presume that a defendant did not waive his rights; the prosecution's burden is great." North Carolina v. Butler, 441 U.S. at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292 (1979).
Christopher acknowledged in his confession that he had been advised of his rights but never stated that he waived those rights. A defendant must understand his rights before a waiver can be inferred. North Carolina v. Butler, supra. There is no evidence that Christopher had the requisite understanding and that there was an implied waiver. The state failed to carry its burden of proving that there was a knowing and intelligent waiver of Christopher's constitutional rights. State v. Brown, 384 So.2d 425 (La., 1980); Dino, supra. The recorded confession must be suppressed.
This assignment has merit.
For the foregoing reasons the ruling of the trial court is affirmed as to Christopher's inculpatory statement to his father. The trial court's ruling on the motion to suppress Christopher's recorded confession is reversed and the matter is remanded for further proceedings.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MARCUS, J., dissents in part and concurs in part and assigns reasons.
BLANCHE, J., dissents and assigns reasons.
LEMMON, J., dissents and will assigns reasons.
*1310 MARCUS, Justice (dissenting in part and concurring in part).
I disagree with the majority's conclusion that the state failed to meet its burden of proving that defendant knowingly and intelligently waived his constitutional rights. It is not contested that defendant was fully informed of his rights. Defendant's father was present when defendant was advised of his rights. Both agreed that defendant would give a statement. There is nothing in the record that indicates that considering defendant's background, experience and conduct, he did not understand that he was impliedly waiving those rights. North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Accordingly, I respectfully dissent from the suppression of defendant's confession; however, I concur in the finding that Mr. Earl Rebstock's statement to the police of what his son (defendant) told him was admissible.
BLANCHE, Justice (dissenting).
After talking with his son, Mr. Rebstock advised the officers that his son had told him he had killed the victim. The officers then asked defendant's father if they could obtain a statement from him, and the father advised that they could. Thereafter, defendant was brought into the room, with his father present, and advised that he was under arrest. Defendant was then given his Miranda rights, which were read from a form. The form was then given to them both, and read by both. In describing the manner in which he read defendant his rights, the officer stated that he would look at the defendant as he was reading the rights, and ask him if he understood. After a reading of the rights, the officer, discerning that both father and son had understood them, then asked the son to sign the acknowledgment at the bottom of the form. Both Christopher and his father acknowledged that their rights had been given them as evidenced by their signatures at the bottom of the form.
At another section of the form, and below the place where defendant and his father signed the acknowledgment that he had read a statement of his rights and that they had also been read to him by the officer, is another form entitled "Waiver of Rights". That form states, "I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure nor coercion of any kind have been used against me." Because Mr. Rebstock did not believe that his son knew what he was doing, he refused to let him sign the waiver of rights form.
Confronted with the refusal, Officer Buras and Mr. Rebstock consulted with Detective Claverie, the officer evidently in charge of the investigation. Detective Claverie testified that Mr. Rebstock advised him that he didn't think his son should sign the waiver. Officer Claverie stated that the essence of what he thought Mr. Rebstock said was that he did not think his son fully understood his rights and, for that reason, he did not want him to sign the waiver. The officer then told Mr. Rebstock as follows: "Mr. Rebstock, if you feel that way, don't sign it." Upon conclusion of the colloquy, Officer Buras asked if he should take a statement, and Detective Claverie stated, "Go ahead and take a statement if Mr. Rebstock wants to make a statement." Thereafter, both left. Officer Buras did take a statement, which was never thereafter objected to by either the defendant or his father.
On one side of the scale, we have the testimony of Officer Buras, who read defendant and his father the Miranda warnings, that they had indicated verbally to him that they understood their rights. A reading of the acknowledgment states as follows:
Before we ask you any questions, you must understand your rights.
You have the right to remain silent. Anything you say can and will be used against you in court.
You have the right to talk with a lawyer for advice before we ask you any questions and to have him with you during questioning.

*1311 If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.
On the other side of the scale, we have a father refusing to permit his son to sign the waiver of rights because he did not think he understood them.
This writer is of the opinion that the mere refusal of the father to permit his son to sign the waiver because he thought his son did not understand his rights does not preponderate on that issue. His rights were explained to him by Officer Buras, and both defendant and his father indicated they understood them. Thereafter, Mr. Rebstock had the option to refuse questioning but, nevertheless, agreed to the taking of his son's statement. Mr. Rebstock is an intelligent person, as is his son who was a 16 year old high school student attending De La Salle High School in New Orleans. It would seem that they would not have difficulty in understanding the simple meaning of rights which were read to them and rights which they, themselves, read.
The sole evidence to indicate that defendant did not understand his rights was the father's refusal to permit him to sign the waiver of rights form and that, to some extent, is equivocal.
This writer is of the opinion that the trial judge was correct in determining that the defendant understood the explanation given to him of his rights, and in denying the motion to suppress. Finally, this writer observes that the majority opinion makes it difficult in the future for this Court to find that an arrestee understood his rights, especially since so many crimes are committed by borderline retardates.
I respectfully dissent.
NOTES
[1] The caller allegedly related that he was having sex with a dead girl, and that he had cut her up and put her in a plastic bag.
[2] The officers testified that Christopher could have remained at his home but did not say he would have been allowed to leave Hiddings' office.