503 So.2d 753 (1987)
STATE of Louisiana, Plaintiff-Appellee,
v.
Donald Ray FREEMAN, Defendant-Appellant.
No. CR 86-708.
Court of Appeal of Louisiana, Third Circuit.
March 4, 1987.
*754 Julie Cullen, Opelousas, for defendant-appellant.
Morgan Goudeau, III, Dist. Atty., I. Jackson Burson, Asst. Dist. Atty., Opelousas, for plaintiff-appellee.
Before GUIDRY, STOKER and LABORDE, JJ.
LABORDE, Judge.
On April 12, 1985, defendant, Donald Ray Freeman, was charged by grand jury with first degree murder, aggravated burglary, and armed robbery. A jury of twelve on January 10, 1986, found defendant guilty of first degree murder, a violation of LSA-R.S. 14:30. The trial judge sentenced defendant to life imprisonment without benefit of probation, parole or suspension of sentence. Defendant appeals his conviction urging three assignments of error. We affirm.

FACTS
At 7:00 a.m. on Thursday, April 11, 1985, Claude Guidry, a 75 year old farmer, was found murdered in his rural residence in St. Landry Parish. Police quickly arrived and secured the area. The coroner's report estimated the time of death to be 7:00 p.m. on the previous evening. The autopsy showed that the victim had been shot in the head with a 12-gauge shotgun. The victim's pockets had been emptied and several *755 household items were determined to be missing.
After interviewing several neighbors about the murder, the police learned that the victim had last been seen alive at approximately 5:30 p.m. on the previous evening. Neighbors reported hearing a gunshot report coming from the victim's house around 7:00 p.m.[1] Neighbors also reported seeing the victim's automobile coming out of the Guidry residence at a high rate of speed approximately 10 to 15 minutes after hearing the shot. Another neighbor testified that the car was being driven by a black man wearing a tan cap. The victim's car was found at approximately 7:30 a.m. near Grand Prairie, Louisiana, on April 11, the morning the victim's body was discovered.
Upon investigating the victim's residence and surrounding fields, police discovered numerous footprints made by a pair of shoes with serrated soles, such as a tennis shoe. The shoe prints were found both inside the residence and in the yard where they led to a small rental house owned by the victim. The rental house was located approximately 100 yards from the Guidry residence and was separated from the main residence by a field. The house (hereinafter referred to as the Fontenot residence) was occupied by Ethlene Fontenot, her common-law-husband and her children. Defendant, Donald Ray Freeman, also resided in the house as the boyfriend of Frunella Fontenot, the daughter of Mrs. Fontenot. All of the occupants of the Fontenot residence were black. The police learned that Mr. Guidry had recently ordered the Fontenots to vacate the house; the police were also told the victim had been in an altercation with one of the male residents of the Fontenot residence.
On the evening of April 11, the police, apprised of these facts, asked Ethlene Fontenot for permission to search her residence for "caps, shoes, and evidence pertaining to the murder of Claude Guidry." The police explained the permission to search form and obtained Mrs. Fontenot's signature. Three officers proceeded to her house to search the premises.
Upon arriving at the Fontenot residence, one officer noticed shoe prints very similar to those at the scene of the murder. After searching the house, the police found a pair of gray running shoes in the bedroom occupied by defendant. The shoes appeared to have the same tread design as those detected in the Guidry residence. When defendant was asked who owned the shoes, he responded that they were his cousin's who was already at the police station. Police seized the shoes, a 12-guage shotgun, and a tan cap, all found in the Fontenot house. The cap was later identified by Frunella Fontenot as belonging to defendant.
Two of the three officers left to compare the shoe tread with the shoe prints at the murder scene. The soles matched the prints precisely. The third officer stayed to search the outside of the Fontenot residence for more prints. Defendant accompanied him. Noticing that defendant was barefooted, the officer asked him where his shoes were. Defendant replied that the deputies had taken his shoes. At this point the officer asked defendant to go to the sheriff's office to discuss the Guidry murder. Defendant agreed to accompany the officer. Defendant was read his Miranda warnings and another officer accompanied him to the station.
Defendant was again advised of his rights when he arrived at the station at 10:30 p.m., and signed a "waiver of rights" card. Defendant was questioned off and on for approximately 5 hours at the sheriff's office. When defendant was initially questioned as to his whereabouts at the time of the murder, defendant answered that he had walked to Plaisance and then hitchhiked a ride into Opelousas. While there, he talked to no one in particular and then hitchhiked a ride to his Uncle's (Michael Freeman) house in Plaisance. After this, both defendant and his uncle went to Opelousas and "messed around"; then defendant's uncle drove him home around 10:00 p.m.
*756 Police immediately attempted to verify defendant's story with his uncle; however, the uncle denied defendant's version of events. Michael Freeman, the uncle, told police that defendant had come to his house on the evening in question around 8:00 p.m. Defendant offered his uncle tires from the victim's Buick, but defendant's offer was declined. Uncle Freeman stated that he was requested to pick defendant up in Grand Prairie. Defendant then drove the Buick to Grand Prairie and abandoned it on a deserted gravel road. Thereafter, the two drove to Opelousas where defendant told his uncle that he had a T.V. and a shotgun that he wanted to sell. The uncle refused to aid the defendant with a sale of these items and eventually drove defendant home to the Fontenot residence around 9:45 p.m. Defendant gave a written statement of his whereabouts at 3:00 a.m. Defendant was formally arrested for the murder of Claude Guidry after his story was discredited by his uncle.
In addition to searching the Fontenot residence, on the night of April 11th, police obtained defendant's permission to search another rental house (the Thierry house) into which defendant and Frunella Fontenot intended to move. Defendant had already paid $100 to the owner, Mrs. Ollie Stevens, for rental of a house and two barns from March 16 to April 16, 1985. On the evening of April 12, 1985, the police, accompanied by Frunella Fontenot, went to the Thierry house and searched for additional evidence. Police found a small trash fire smoldering in a half-sunken bath tub. Two rosaries and a set of keys were found in the debris. The keys were tested and opened the doors to the Guidry residence. The remains of the rosaries were identified at trial as being very similar to those which had belonged to Mrs. Guidry.
On May 24, 1985, the chief of detectives, Roy Mallet, received a telephone call from defendant's cell-mate, Mr. Danny Graffagnino. In exchange for Mr. Mallet assisting Mr. Graffagnino making trusty at Angola, Mr. Graffagnino testified. Through stipulation, the witness testified that defendant had said to him that he had had nothing to do with the murder of Mr. Guidry, but that someone had given him some items to hold; namely, a television and several guns. The witness also related that defendant stated that he had hidden these items in a barn out at the Thierry house. These items and several others were recovered by police and all were later identified as having belonged to the victim. One of the guns found in a barn was missing the rifle bolt. A solitary rifle bolt was found during the search of the victim's residence. Police determined through testing that the rifle bolt found in the victim's residence came from the .22 caliber rifle found at the Thierry house. Additionally, Mr. Jim L. Churchman, a forensic scientist for the Louisiana State Police Crime Lab, determined that the shell found at the crime scene was fired by one of the shotguns found at the Thierry estate.
The following additional evidence was adduced at trial: Defendant had given his girlfriend, Frunella Fontenot $165 in cash on the night of the murder and had told her that he had borrowed this money from someone. Defendant later told the police that he had earned this money from working the previous week for Mr. Vernon White. A police investigation revealed that defendant had not earned this much money. There was also testimony from the victim's daughter, Ms. Bonnie Goudeau, that the victim usually kept a large amount of cash on hand. Inside of the victim's house, defendant's right palm print was found on the lid of the freezer and on a cayenne pepper jar. Directly behind the freezer was found a window screen that was missing from a window which police suspected was the point of entry for the perpetrator of the crime.

ASSIGNMENTS OF ERROR NOS. 1 AND 2
Defendant contends that the trial court erred when it denied defendant's motions to suppress all evidence seized and all statements made by defendant or by defendant's uncle. Defendant claims that the evidence seized and the statements given were the result of an illegal arrest which violated defendant's fourth and fourteenth *757 amendment rights against unreasonable search and seizures. Defendant claims he was actually arrested when he was initially asked to go to the sheriff's station for questioning and not when the state formally arrested him in the wee hours of April 12. Defendant contends that because there was insufficient probable cause to arrest defendant at this earlier point in time, any statements or evidence discovered because of this illegal arrest should have been suppressed at trial.
Defendant bases his claim that he was illegally arrested on an officer's statement made at the motion to suppress hearing. At this hearing, the officer who had asked defendant to go to the sheriff's office testified that, although defendant voluntarily agreed to go, he would have brought him anyway if defendant had refused. Defendant contends that this statement indicates that defendant was under arrest from this moment on and that because there was insufficient probable cause to support the arrest, the arrest was illegal and a violation of defendant's constitutional rights.
The questions thus presented in these assignments are: A. did the officer's request to defendant to answer questions at the police station constitute an arrest because the officer stated that he would have made the defendant go if he had refused; B. if so, did the arrest lack probable cause, thus rendering it illegal; and C. if there was no probable cause to arrest, should the statements given and evidence seized be suppressed even though they were obtained through information voluntarily given by defendant?

A.
La.C.Cr.P. art. 201 defines arrest as "the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him." Our jurisprudence holds that an arrest occurs when "circumstances indicate an intent to effect an extended restraint on the liberty of the accused, rather than at the precise time an officer tells an accused he is under arrest." State v. Raheem, 464 So.2d 293, 296 (La.1985); State v. Ruffin, 448 So.2d 1274, 1279 (La.1984).
In State v. Thibodeaux, 414 So.2d 366, 368 (La.1982), our Supreme Court instructed that:
"Whether a person has been taken into custody, detained or deprived of his freedom in a significant way must be decided by an objective test. State v. Liner, 397 So.2d 506 (La.1981); State v. Menne, 380 So.2d 14 (La.1980). Neither the defendant's subjective impression nor the formality of an official arrest will be determinative of the issue of his claimed illegal detention. State v. Menne, supra. Rather, all of the circumstances surrounding the defendant's transportation to the stationhouse and questioning should be evaluated." (Emphasis added).
In Thibodeaux, 414 So.2d at 368, the court held that defendant was not under arrest when two plain-clothes officers advised him of his rights and requested defendant to accompany them to the police station; however, in Thibodeaux, the officers specifically told defendant that he did not have to come with them.
In State v. Liner, 397 So.2d at 513, our Supreme Court stated that the determination of whether one is "in custody" shall be determined by the objective standard of the "reasonable interrogee" under the totality of the circumstances. The court in Liner held that the defendant was not under arrest when the defendant had answered questions on four separate occasions and twice went to the police station for questioning. The officer testified that had the defendant requested to leave, he would have been allowed to do so. Id. at 512. The court held defendant was not arrested because under the totality of the events surrounding the case, it was clear that a "reasonable interrogee" would not have a reason to feel that he had been deprived of his freedom in a significant way, at least not until this defendant had changed his statements from exculpatory to inculpatory. Id. at 513.
*758 In U.S. v. Davis, 328 F.Supp. 350 (E.D. La., 1971), the court was presented with facts similar to the case at bar. In Davis, the defendant was asked to go to the police headquarters. Defendant agreed and another officer accompanied him to the station. As in the case at bar, the defendant was not told that he was under arrest, but the original officer testified that had the defendant refused to go to headquarters, he would have been arrested. The court ruled that this defendant was under arrest from the moment he was asked to visit the station house.
In State ex rel. Bailey v. City of West Monroe, 418 So.2d 570, 572 (La.1982), in footnote # 1, the defendant's daughter was found to be technically under arrest when the officer held her for questioning. The police officer had testified that he would not have allowed her to walk off after he approached her for questioning. See State v. Wichers, 392 So.2d 419 (La.1980); State v. Morvant, 384 So.2d 765 (La.1980).
In State v. Statum, 390 So.2d 886, 888 (La.1980), cert. denied, 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 619 (1981), the police asked the defendants to answer questions at the sheriff's office. The defendants drove themselves and there was no testimony by police that the defendants would have been forced to go if they had refused. The court held that under these facts the defendants were not under arrest, but instead were voluntarily assisting in a murder investigation. Id. at 889.
Applying the "reasonable interogee" test as outlined in State v. Liner, 397 So.2d at 513, defendant was technically under arrest at the time the officer asked him to answer questions at the station. A "reasonable interrogee" would have a reason to feel that he had been "deprived of his freedom of action in a significant way." Defendant was not free to decline the police officer's request. Defendant did not have this freedom: he was under arrest.
Defendant's detention can not be characterized as a temporary investigatory stop, thus not requiring probable cause to arrest. La.C.Cr.P. art. 215.1 allows a law enforcement officer to stop a person in a public place whom he reasonably suspects is committing, has committed or is about to commit an offense and may demand of him his name, address, and explanation of his actions. In Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the court found that an arrest occurred, not an investigatory stop, where the suspect was not questioned briefly, was transported to the police station, was never informed that he was free to go and in fact would have been restrained had he tried to leave. In the case sub judice, the questioning was not made in public, the stay was lengthy, and the extent of the questioning was profound; thus, this was not an investigatory stop.

B.
Defendant was under arrest from the time the officer requested that he go to the station for questioning. For a warrantless arrest to be legal, it must be based on probable cause. State v. Thomas, 349 So.2d 270, 272 (La.1977). Probable cause for a warrantless arrest exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a person of average caution in the belief that the suspect to be arrested has committed an offense. State v. Morvant, 384 So.2d 765, 768 (La.1980). Probable cause need not be established by evidence sufficient to convict; the arresting officer need not be convinced beyond a reasonable doubt of arrestee's guilt and the standard of probable cause to believe is a lesser degree of proof determined by the setting in which the arrest took place together with the facts and circumstances known to the arresting officer from which he might draw conclusions warranted by his training and experience. State v. Boyd, 349 So.2d 1256, 1258 (La.1977).
One of the most important factors in determining if probable cause existed is satisfied when police officers know that a crime has actually been committed. State v. Crain, 409 So.2d 603, 605, 606 (La.1982). In such a case, the police need only demonstrate probable cause to identify the person *759 who committed the crime. State v. Sterling, 444 So.2d 273, 278 (La.App. 1st Cir. 1983), affirmed after remand, 462 So.2d 290 (La.App. 1st Cir.1984), writ denied, 466 So.2d 466 (La.1985).
At the time of the defendant's arrest, the arresting officer knew the following facts: The victim had been shot in the head with a shotgun; the culprit probably stole the victim's car; the perpetrator was probably wearing shoes with serrated soles; the shoeprints of the serrated soled shoes lead from the Fontenot residence to the victim's house; soon after the estimated time of death, a black male wearing a tan cap was seen speeding in the victim's car; defendant is black; defendant had just admitted to owning shoes with what appeared to be identical sole serrations as those seen at the murder scene; similar serrated-sole shoeprints were seen around the Fontenot residence; a tan cap fitting the earlier description had just been located in the house where defendant resided; the officer knew the defendant had previously lied when initially asked about the ownership of the shoes. It appears that with the knowledge of all of the above facts, the arresting officer had probable cause to conclude that defendant had committed this crime. As stated earlier, probable cause to arrest need not be established by evidence sufficient to convict.

C.
Assuming arguendo that there was no probable cause to arrest, the evidence seized and the statements taken as the result of an illegal arrest should be excluded if such evidence was obtained by exploitation of such illegal detention. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); State v. Rebstock, 418 So.2d 1306, 1308 (La.1982). However, searches made after an illegal arrest are not per se invalid. A valid consent to a search is a well recognized exception to the warrant requirement and evidence obtained through such a search need not be based on probable cause. State v. Angel, 356 So.2d 986 (La.1978); see Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntary consent to a search after an illegal detention is valid under circumstances which show no exploitation of the illegality. State v. Angel, 356 So.2d at 989; State v. Baker, 338 So.2d 1372 (La.1976). Defendant voluntarily consented to the searches at the Fontenot residence and at the Thierry estate. He timely signed consent to search forms. No suggestion of coercion was advanced. There was no exploitation of the allegedly illegal arrest regarding these searches. The evidence seized in these searches, assuming no probable cause for the arrest existed, was properly admitted.
Defendant contends that his statements made after his illegal arrest were also suppressable because they were the direct result of his illegal arrest. Defendant made two exculpatory statements during his interrogation. The final statement was put in writing and introduced into evidence as a state exhibit. These statements lead to the police questioning defendant's uncle, whose statement directly implicated the defendant. Defendant contends these statements must be suppressed as "fruit of the poisonous tree."
Again, assuming that the arrest was invalid (which it was not), a confession obtained through custodial interrogations after an illegal arrest should be excluded unless the intervening events break the causal connection between the arrest and the confession so that the confession is "sufficiently an act of free will to purge the primary taint." Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); State v. Arceneaux, 425 So.2d 740, 743 (La.1983).
Thus, defendant's statements, if the result of an illegal arrest, are admissible only if there was a break in the causal connection between the statements given and the illegal arrest. In this instance, defendant was given Miranda warnings on two separate occasions and, arguable, this could break the causal connection. While Miranda warnings administered to a subject may be one factor in making this determination, it does not per se make the confession sufficiently attenuated from the illegal *760 arrest. Other factors, such as the temporal proximity of the arrest and the confession, the presence of the intervening circumstances and the purpose and flagrancy of the official conduct are matters to be considered. State v. Giovanni, 375 So.2d 1360, 1364 (La.1979).
In this case, it appears that the statements were sufficiently attenuated. The defendant voluntarily went to the station house and gave the inculpatory statements. There was no evidence of coercion of any form. Additionally, there was no evidence of officer misconduct. The statements were properly admitted even if the arrest was invalid.
Defendant also claims that the statements from the defendant's cellmate, Danny Graffagnino should have been suppressed because this was the result of the illegal detention.
Defendant's contention lacks merit. In State v. Giovanni, 409 So.2d 593, 599 (La.1982), the court held that statements made to a fellow inmate, after defendant had been illegally arrested, were admissible since the inmate was not planted in jail by the authorities and it did not appear that defendant made statements under influence of alcohol or duress. Thus, the statements were held sufficiently attenuated from the initial arrest to be admissible.
In this case, assuming the arrest was illegal, the same facts apply. Mr. Graffagnino was not planted by the authorities and there is no evidence of duress, coercion or other outside influences. Also, defendant made these statements more than three weeks after his arrest. There appears to be no connection between the initial arrest and the statements in question. There must be a causal connection between the illegal arrest and the evidence for the exclusionary rule to apply. Id. at 599. In this instance, no causal connection is apparent. These statements were properly admitted at trial.
For the above reasons, defendant's first and second assignments of error lack merit.

ASSIGNMENT OF ERROR NO. 3
Defendant contends the trial court erred when it allowed the state to challenge a juror for cause.
La.C.Cr.P. art. 800(B) provides that:
"B. The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law."
Under La.C.Cr.P. art. 799, the state was given 12 peremptory challenges. Therefore, before defendant can complain that the state was improperly allowed to challenge a juror for cause, the state must have used up all 12 peremptory challenges and in effect been given an additional peremptory challenge. In this instance the state used only 9 of the 12 peremptory challenges. Therefore, the defendant has no grounds to challenge the state's challenge for cause. This assignment lacks merit.
For the above and foregoing reasons, the conviction and sentence of defendant are affirmed.
AFFIRMED.
NOTES
[1] Gunshots were not unusual in this rural community; so the neighbors were not alarmed.